44 Cal.App.4th 1352 (1996)
52 Cal. Rptr.2d 474
In re RONELL A. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
RONALD A. et al., Defendants and Appellants.
Docket No. B094255.
Court of Appeals of California, Second District, Division Three.
April 5, 1996.
*1356 COUNSEL
Roni Keller and Evelyn Francis Baran for Defendants and Appellants.
De Witt W. Clinton, County Counsel, Joe Ben Hudgens, Principal Deputy County Counsel, Jones, Day, Reavis & Pogue, Elwood Lui and Laura A. Matz for Plaintiff and Respondent.
OPINION
ALDRICH, J. 

INTRODUCTION
Father Ronald A. and mother Louise H. appeal from the juvenile court's rulings terminating their parental rights over minors Ronell A. and Cordero A. and ordering adoption as a permanent plan. Father contends the court erroneously (1) failed to appoint a guardian for him which guardian was necessary because of father's "chronic mental condition and emotional disability," and (2) ordered the minors be adopted. In a separate appeal, mother contends the court (1) failed to rule that reasonable reunification services had been provided to her, and (2) improperly delegated to the department of children and family services (the department) discretion to determine whether visitation would occur. Because, appellants have demonstrated no reversible error, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
This family has a history of child abuse and endangerment and involvement with the department dating back to 1988. For reasons which will become clear below, father and mother see each other very infrequently. Mother and the three children, Lareal H. (who is not a child of Ronald A.), Ronell A. and Cordero A., had been living with the paternal grandparents.

*1357 Mother

With respect to the instant action, just three months after the court had terminated a previously ordered departmental supervision of the minors, the department again filed a petition. An amended version was entered on January 15, 1993, naming all three children.[1] The petition was occasioned after Ronell, who was three years old at the time, was hospitalized suffering from third degree burns on 35 percent of his body, including his genitals, legs, feet and left hand. Ronell lost all of his skin on the affected areas and his physician gave him only a 50 percent chance of survival. Such injury was occasioned by mother who forced Ronell to take a bath in extremely hot water. Ronell's doctor also found facial burns and a cut upper lip which indicated Ronell "had purposely been held down in the hot bath water" anywhere from 30 seconds to 5 minutes depending on the water temperature. He explained, "the only way ... these severe burns could have been obtained were with ... somebody intentionally inflicting them on the child." Ronell remained at the burn center for three months. Hours elapsed before anyone sought medical help. Ronell will continue to undergo skin grafts for his burns until his body finishes growing.
The petition further alleged such abuse endangered the physical safety of Ronell's siblings as there is a substantial risk that Lareal and Cordero would be abused as well. With respect to Cordero, the placement center to which he was sent after this incident "ha[d] seldom seen `such a traumatized child as young of age as he is'" with the result he will need ongoing psychiatric care as soon as he is old enough to benefit by it. At the time, Cordero was one and one-half years old.
Mother was arraigned on January 15, 1993, and pleaded guilty to felony injury to a child in exchange for a sentence of six years in state prison. Mother has been incarcerated in state prison, since the inception of this case, where she remains. The minors were declared dependents of the court on February 2, 1993, and separately placed in foster care. On March 11, 1993, an amended petition was sustained as to Welfare and Institutions Code section 300, subdivisions (a) and (e) for Ronell, and section 300, subdivision (j)[2] for Cordero.
At the contested dispositional hearing, held on June 1, 1993, the court found by clear and convincing evidence a substantial danger existed to the physical health of Ronell and Cordero if they were returned to their parents' *1358 custody. The department recommended "permanent placement services with no reunification" be provided mother as the result of the extreme severity of the injury she caused Ronell and her unsuccessful history of involvement with the juvenile dependency system. Nevertheless, the court ordered the department to provide family reunification services and, at the request of mother's counsel, to arrange visitation for mother while she was incarcerated.

Father
On April 14, 1993, the department filed a petition under section 342, alleging father's inability to care for the minors. The petition alleged father has the mental capacity of a 12-year-old and been diagnosed as schizophrenic characterized by unpredictable violence, which had caused others injury, and which periodically renders him unable to care for the minors. Father's antipsychotic drugs do not prevent his outbursts and he is considered to have poor impulse control. Father compounds these problems with drug abuse, including crack cocaine.
At the time the petition was filed, father was incarcerated. Earlier, father had run away from a residential drug treatment program, where he was sent as part of a court-ordered diversion plan after his arrest for possession of narcotics. This time, father has been housed at a rehabilitation center for mentally ill inmates. This center reported father "`can barely care for himself and cannot care for young children.'" Father receives a disability payment which is sent to a payee who ensures father receives food, clothing and housing.
Before the April 26, 1993, adjudication hearing, the department's social worker recommended father be placed in a residential drug counseling program and ordered into an intensive parenting program. The department also recommended the court order a psychological evaluation for father to determine whether family reunification was even appropriate, as the department's workers had "serious concerns" that father would never be able to care for the minors. Father has never attended a parenting program in spite of court orders that he do so the previous two times the minors were made dependents of the court. Nevertheless, father had declared to the department social workers that he wanted to have his children with him and would like to visit his children while undergoing his drug treatment.
On May 6, 1993, the court sustained this petition as to the father pursuant to section 300, subdivision (b). The court ordered that "[f]ather may take minors from foster care if accompanied by [a departmental] approved monitor."
*1359 At the dispositional hearing conducted for the father on July 26, 1993, the court found by clear and convincing evidence a substantial danger to the physical health of Ronell and Cordero if they were returned to the father, and that reasonable efforts were made to prevent or eliminate the need for the minors' removal from the home.

Reunification Services
The court ordered father into parenting and drug counseling as well as a mental health program. As for mother, the department put together a plan under which mother was to attend parenting classes and a drug rehabilitation program.
Mother did not ask to see Ronell until September 9, 1993, nine months after her arraignment. The department arranged with his foster mother to take Ronell to Sybil Brand Institute. But, when mother learned that Ronell could not be brought into the attorney's room, she canceled the visit. Then, mother requested the department not contact her while in prison because she feared other inmates would identify her as a child abuser. By mother's six-month review she had been transferred to the Women's Facility at Chowchilla. The department learned mother could fulfill her reunification requirements at that prison.
In the period before father's six-month review, father received numerous referrals for intake at mental health centers, and admits to knowing about parenting programs. However, father never followed up on these referrals, and the department noted father "has the tendency to lose every referral given him."
On January 24, 1994, the children's social worker requested the court grant the department an exception to the visitation requirements because mother "has specifically requested [the department] not contact her in prison as she fears being identified by the other inmates as a child abuser." In February 1994, the department learned the trip from Los Angeles to Chowchilla is six hours' driving time one way, and the wait at the prison to retrieve the inmates once the visitors had arrived was an additional one and one-half hours. Departmental reports from March and April 1994 indicate the boys' foster mothers stated it would be a "great hardship" in both time and expense to travel the six hours one way and stay overnight to facilitate visits between the minors and their mother. The department cannot undertake to make the visits because the distance required an overnight stay which "is against departmental policy [against] any children[']s social worker to spend overnights with a dependent minor."
*1360 In March 1994, the department reported, father explained the reason for his failure to comply with the court orders was because he feared if he did comply, the court would order him to care for his children, which he is unable to do. Father repeatedly reported to his attorney he cannot care for himself or for his children. In April 1994, father indicated he was also reluctant to comply with the drug abuse counseling and parenting classes. Father explained that the department had given him many referrals, but he had "decided not to use them."
On May 6, 1994, the six-month review hearing was held for both parents. The court found reasonable efforts to reunite the children with their father had been made but such reasonable efforts had not been made with respect to mother. Learning about the difficulty the department and foster parents had in taking the children to Chowchilla, the court authorized paternal grand-parents to take Lareal and Cordero for monthly overnight visits to the prison if they so desired, with the caveat that visits be "with minors' consent." (Italics added.)
In the court-ordered progress report filed in advance of the 12-month review, the department indicated the boys were making good progress. Both Cordero's and Ronell's foster mothers indicated they wished to adopt the boys.
In July 1994, the department reported father called at the beginning of every month to arrange for a monthly bus pass but he "infrequently" used such passes to visit his children. The department then learned father had moved to San Diego in January 1994, where he did not follow up on referrals for mental health and parenting programs. Father indicated to the department that his family was pressuring him to obtain custody of the minors but that he is unable to care for them and he wants the foster mother to obtain legal guardianship as soon as possible. Father did participate in an updating of the case plan.
At the 12-month review for both parents, held on September 19, 1994, the court found reasonable efforts at reunification for mother and father had been made but that by a preponderance of the evidence it would be detrimental to return the minors to their parents and there exists no probability the minors would be returned to their parents within the next six months. The court ordered the department to provide permanent placement services pursuant to section 366.26.
By February 1995, father was back in prison.
In advance of the 18-month review, the department reported it was arranging a visitation schedule for the children and their mother as the *1361 grandparents had indicated an interest in taking the children to Chowchilla. However, the department recommended the two boys be adopted because mother was not in a position to assume responsibility for the children and would not be a suitable caretaker even if she were released from jail; father had clearly stated to the department he is unable to care for the children. Because of the care given Ronell by his foster mother, the department concluded she would be an excellent adoptive parent. Ronell's guardian ad litem recommended parental rights be terminated and he be adopted by his foster mother. However, Cordero's guardian recommended guardianship for Cordero, which would offer him permanence while allowing for legally enforceable, ongoing contact with his half sister.
At the permanency planning hearing held on July 13, 1995, the court considered the entire file and heard testimony from the foster parents. The court also found it would be detrimental to return the children to the custody of their parents and ordered that parental rights be terminated, finding by clear and convincing evidence that the minors will be adopted. These appeals followed.
Additional facts will be discussed below.

CONTENTIONS
Mother contends reasonable reunification services were not provided to her and the court improperly delegated to the department the power to determine that visitation with Cordero was "deemed unreasonable." Father contends the trial court erred by failing to appoint a guardian for him and by ordering adoption rather than legal guardianship as a permanent plan.

DISCUSSION

A. Mother.

1. Reasonable reunification services were provided for mother.

(1a) Mother contends the court erred in ruling at the section 366.26 hearing that reasonable reunification efforts had been made on her behalf.
(2) In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all reasonable and legitimate inferences to uphold the judgment. (In re Misako R. (1991) 2 Cal. App.4th 538, 545 [3 Cal. Rptr.2d 217].) "If there is any substantial evidence to support the findings of a juvenile court, *1362 a reviewing court is without power to weigh or evaluate the findings." (In re Carrie W. (1978) 78 Cal. App.3d 866, 872 [144 Cal. Rptr. 427].)
(3) The adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case. (In re Michael S. (1987) 188 Cal. App.3d 1448, 1454 [234 Cal. Rptr. 84].) With respect to the plan itself, "[e]ach reunification plan must be appropriate to the particular individual and based on the unique facts of that individual. [Citations.]" (In re Misako R., supra, 2 Cal. App.4th at p. 545.) "The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success. [Citation.]" (In re Dino E. (1992) 6 Cal. App.4th 1768, 1777 [8 Cal. Rptr.2d 416].) "[T]he focus of reunification services is to remedy those problems which led to the removal of the children...." (In re Michael S., supra, at p. 1464.) "[T]he record should show that the [department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the [mother] during the course of the service plan, and made reasonable efforts to assist the [mother when] compliance proved difficult...." (In re Riva M. (1991) 235 Cal. App.3d 403, 414 [286 Cal. Rptr. 592], italics deleted.)
(1b) Viewing the evidence in a light most favorable to the respondent, we hold, under the circumstances of this case, the court did not abuse its discretion in concluding reasonable reunification services were provided to mother.
With respect to incarcerated parents, section 361.5, subdivision (e)(1) sets forth the requirements for reasonable reunification services. It states, "[T]he court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the minor.... Services may include, but shall not be limited to, all of the following: [¶] (A) Maintaining contact between parent and child through collect phone calls. [¶] (B) Transportation services, where appropriate. [¶] (C) Visitation services, where appropriate. [¶] (D) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child. [¶] An incarcerated parent may be required to attend counseling, parenting classes, or vocational training programs as part of the service plan if these programs are available."
Because the court did not make a finding of detriment to the minor under section 361.5, subdivision (e), reunification services were required for mother who was incarcerated. At the dispositional hearing for mother, the court did order the department to provide reunification services for mother, *1363 in spite of the department's recommendation such services not be provided to her.
Turning to the adequacy of the services, it was not feasible to arrange for telephone calls and letters between Cordero and his mother pursuant to section 361.5, subdivision (e)(1)(A). The boy was not even two years old when he was taken from his mother's custody. Also, mother had specifically requested she not be contacted in prison.
The department did organize a plan under which mother was to attend parenting classes and a drug rehabilitation program (§ 361.5, subd. (e)(1)), which was designed to respond to the drug and child abuse which led to the removal of Cordero and Ronell in the first place. (In re Michael S., supra, 188 Cal. App.3d at p. 1464.) The department made clear to mother and her prison counsel the importance of early participation in the programs. Mother knew of these requirements because the record is replete with references to mother's obtaining these services in prison. Further, the record demonstrates the department made repeated efforts to assure mother was attending such classes. That mother was only able to participate in such programs at the end of her sentence is not the fault of the department. Nor was the department in any position to rectify this problem: prisons are run by the Department of Corrections, not the department of children's services. The department was also stymied by mother's specific request the department not contact her or send her anything, including the required monthly contact letters, for fear other inmates would label her a child abuser. We hold the department did make reasonable efforts to ensure mother's meaningful participation in the reunification plan.
Mother appears most concerned about the department's efforts to facilitate visits between her and Cordero (§ 361.5, subd. (e)(1)(C)), arguing the department's failure to ensure Cordero visited his mother rendered the reunification services unreasonable.[3]
At the disposition hearing for mother, the court specifically ordered visitation while mother was incarcerated. Further, the record shows the department made efforts to arrange for visits but the practical realities prevented success. The long distance between Los Angeles and Chowchilla posed a tremendous obstacle to the foster parents and to the department which was itself prevented by departmental policy from escorting the children on overnight stays. Still, on May 6, 1994, the court found reasonable efforts had not been made regarding mother. As a solution, the court ordered *1364 the paternal grandparents would be authorized to take Cordero for monthly visits to mother in prison with minor's consent, to include overnight visits.[4] By the end of July 1994, the department reported it was working out a regular visitation schedule with the California Women's Facility at Chowchilla as the paternal grandparents finally expressed a willingness to transport Cordero and Lareal to the prison.
Failure to provide for visitation for an incarcerated parent has been found unreasonable where the prison was not excessively distant and where the inmate was allowed weekend visits in a visiting room and occasional two-day family visits in a facility resembling an apartment. (In re Monica C. (1995) 31 Cal. App.4th 296, 307 [36 Cal. Rptr.2d 910].) Also visitation plans were held unreasonable for an incarcerated parent where the prison was 40 miles from the where minor lived and the mother had substantially complied with the service plan. (In re Brittany S. (1993) 17 Cal. App.4th 1399, 1407 [22 Cal. Rptr.2d 50].) However, this case is entirely distinguishable from Monica C. and In re Brittany S. Not only is mother's prison a full day's drive distant, requiring an overnight hotel stay, insupportable expense to the foster parents and an additional one-and-one-half-hour wait for the prisoner to be brought into the visiting room, but mother canceled visits and otherwise failed to comply with the service plan.
Most important, this case is wholly distinguishable in one essential respect: unlike the two cases on which mother relies, here, mother is serving time exactly because of the abuse she committed on her own dependent child.
Section 361.5, subdivision (e)(1) authorizes reasonable services for incarcerated parents to include "(C) Visitation services, where appropriate." (Italics added.) Given the above described constraints, this was clearly a case where such services were not appropriate. For that reason, the court understandably concluded at the May 6, 1994, review hearing following the *1365 six-month hearing, "because of her incarceration, it is reasonable not to have offered her reasonable services."[5]
Equally important, section 366.21 provides, "in determining whether return of custody to the parent `would create a substantial risk of detriment' to the child, the court must consider ... whether the parent has `cooperated and availed himself or herself of services provided.'" (In re Monica C., supra, 31 Cal. App.4th 296, 303-304, italics added.)
Notwithstanding the department's attempts, and her arguments on appeal to the contrary, in the two and one-half years between the filing of the petition and the termination of mother's parental rights, mother manifested little interest in maintaining contact with Cordero and failed to cooperate or avail herself of the services. In late 1993, the department arranged to take Cordero to visit his mother but noted "Mother initially expressed no interest in seeing [the] minor. She then wanted to see [the] minor but decided against it upon learning [the department] could not bring him into the attorney's room for a visit." (Italics added.) By July 1994, a year and a half after the petition was filed, mother had called the department only twice to ask "briefly" about Cordero. (Italics added.) Moreover, mother's request the department not send anything to her because she did not want to be identified as a child abuser further belies her interest in pursuing reunification with Cordero. In short, mother simply showed little interest in following through with any visitation plan. "Reunification services are voluntary ... and an unwilling or indifferent parent cannot be forced to comply with them. [Citations.]" (In re Mario C. (1990) 226 Cal. App.3d 599, 604 [276 Cal. Rptr. 548]; In re Michael S., supra, 188 Cal. App.3d 1448, 1463.)[6]
In any event, even if the court erred in ruling the reunification services were reasonable, which is not our holding, we conclude the error would not be prejudicial. Section 361.5, subdivision (e)(1) specifically states reunification services for an incarcerated parent are subject to the 18-month time *1366 frame. When a child cannot be returned to the parent within the statutory time frame, the court is required to establish a permanent plan for the child and refer the case for a section 366.26 hearing. Mother was sentenced to six years in prison and would not be released until 1999, well past the eighteen-month period. Stated otherwise, a different reunification plan would not have made a difference in the outcome.

2. Delegation of authority.

(4) Mother contends as the determination whether there should be visitation and how much is exclusively a judicial one, the department's "determination that visitation [with mother] at Chowchilla was `deemed unreasonable' was tantamount to an order denying mother visitation." Mother essentially argues the court's order granting the department complete discretion to determine whether visitation should occur is invalid and effectively denied mother all visits. Not so.
In pursuit of this argument, mother relies principally on the April 27, 1994, departmental report which indicated Lareal's caretaker balked at taking Lareal to Chowchilla because it was too far. The department concluded "At this time visitation between mother and minor [Lareal] would be deemed unreasonable...." Mother argues the court's ruling it was reasonable not to have offered services to mother because of mother's incarceration was based on the above report and that such report must also relate to Cordero. Because this appeal does not in any way concern Lareal, we fail to see the relevance of this statement to the reunification services provided to mother for Cordero. Moreover, it is irrelevant that the department reached such a conclusion. Only nine days after this report was filed, the court stated reunification services had not been provided mother and issued specific orders that Cordero be allowed overnight visits to Chowchilla. It is manifest from the record in spite of the department's lackluster performance the court made orders concerning visitation with mother, initially at counsel's request and again in May 1994. There is no delegation of discretion to the department in this case.

B. Father.

1. The court did not commit reversible error in failing to appoint a guardian for father.

(5) Father first contends the court had a sua sponte duty to inquire into whether a guardian should be appointed for father given his mental incapacity pursuant to section 372 of the Code of Civil Procedure.
*1367 Code of Civil Procedure section 372 provides, in relevant part, "A guardian ad litem may be appointed in any case when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient to appoint a guardian ad litem to represent the ... incompetent person...." Code of Civil Procedure section 373 further provides, "When a guardian is appointed, he or she shall be appointed as follows: [¶] ... [¶] (c) If an ... incompetent person is a party to an action or proceeding, upon the application of a relative or friend of such ... incompetent person, or of any other party to the action or proceeding, or by the court on its own motion."
In In re R.S. (1985) 167 Cal. App.3d 946 [213 Cal. Rptr. 690], the court set forth a standard for determining when a guardian should be appointed in these circumstances. There, the mother contended the trial court erred in failing to appoint a guardian ad litem for her and that her counsel was ineffective for having omitted to request an examination of her competency. (Id. at pp. 978-979.) The reviewing court rejected these contentions, stating, "Notwithstanding [the mother's] documented mild mental retardation and her dependent personality disorder, the record here establishes that [the mother] did understand the nature of the proceedings against her and was able to meaningfully participate in those proceedings and to cooperate with her trial counsel in representing her interest. [¶] We therefore conclude that neither the trial court nor [the mother's] trial counsel ignored evidence that [the mother's] abilities were so limited that she was effectively rendered incompetent to understand the nature of the proceedings or to assist her counsel in representing her interest so as to require appointment of a guardian ad litem." (Id. at pp. 979-980; cf. In re Christina B. (1993) 19 Cal. App.4th 1441, 1450 [23 Cal. Rptr.2d 918]; Pen. Code, § 1367, subd. (a).)
Here, it is clear father understood the nature of the proceedings against him, was able to participate meaningfully in such proceedings and cooperate with his counsel in representing his interests. (In re R.S., supra, 167 Cal. App.3d at pp. 979-980.) Not only has father had some high school education but the court had appointed counsel for father from the time of the original detention and throughout the entirety of these proceedings, and father cooperated with his attorney. Father even participated in updating the case plan.
Nor was the court unaware of father's condition. There was repeated testimony and reference in the file of father's "chronic mental illness and substance abuse." The court also appointed guardians ad litem for the minors. In spite of all these indications, it is clear the reason the court did not act on its own initiative to appoint a guardian for father was it did not consider father incompetent. At the section 366.26 hearing, the court stated: *1368 "I heard him testify over the course of this trial in the proceedings, and he does not appear to be an incompetent to me." (Italics added.) In short, we conclude the trial court did not abuse its discretion in failing to exercise its express power under section 373 of the Code of Civil Procedure to act sua sponte to appoint a guardian ad litem for father when he appeared to be incompetent.
Father points to the court's acceptance of his waiver of appearance at the section 366.26 hearing as evidence of prejudice caused by the failure to appoint a guardian. Such action by the court was neither error nor reversible. Father was always represented by counsel. The first time the court received father's waiver was on April 24, 1995, at a section 366.26 hearing. Counsel explained she was unaware father had signed the waiver and objected to it. As noted above, in the court's opinion, father understood the nature of the proceedings and the effect of his waiver, and repeated father's indication he agreed with the department's recommendations. In an abundance of caution, the court continued the permanent planning hearing as to Ronell and Cordero and warned counsel it would accept the next waiver from father unless counsel could demonstrate father did not understand the waiver. At that hearing counsel argued strenuously father did not know what he had signed and did not intend to waive his right to appear. A guardian could not have made a more gallant effort on father's behalf. No prejudice has been shown.

2. No abuse of discretion in ordering termination of parental rights.

(6) Father next contends the trial court should have ordered guardianships for the children in lieu of adoption as the permanent plan. Father argues an overriding preference for the preservation of the family must prevail in this case.
"At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child.... The permanent plan preferred by the Legislature is adoption. [Citation.]" (In re Beatrice M. (1994) 29 Cal. App.4th 1411, 1416 [35 Cal. Rptr.2d 162], italics added, citing § 366.26, subd. (b)(1)(4).) If the court finds the child is adoptable, it must terminate parental rights absent circumstances under which it would be detrimental to the child. (29 Cal. App.4th at p. 1416.) A guardianship "is `not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.' [Citation.]" (In re Teneka W. (1995) 37 Cal. App.4th 721, 728 [43 Cal. Rptr.2d 666].)
The record here shows by clear and convincing evidence Ronell and Cordero were adoptable. Both foster mothers expressed the desire to adopt *1369 their charges. Cordero's foster parents were willing to adopt him despite the accompanying reduction in the county's monetary support. It was clear to the department that Cordero loved his foster mother. Thomasine S., Ronell's foster mother, had cared for Ronell for his entire life except for a very short period during which the minor was critically burned. Ms. S. took care of Ronell daily when he was in the hospital, understood the physical impact of his trauma and the long-term medical implications of the injury. The foster mother explained, "I love this child, and I am very attached to him. He's very attached to me." Ronell calls his foster mother "mommy." Even Ronell's guardian ad litem recommended to the court he be adopted.
More important, none of the circumstances enumerated in the statute exist that would justify a disposition other than adoption. Subdivision (c)(1)(A)-(D) of section 366.26 lists the circumstances under which adoption would be deemed detrimental to the minor. None of these subdivisions applies in this case: The boys are not 12 years or older. (Subd. (c)(1)(B).) Adoption is not "unlikely or undesirable." (Subd. (c)(1)(C).) The minors are not living with foster parents who are unable or unwilling to adopt them. (Subd. (c)(1)(D).) Father did not maintain "regular visitation" and contact with the minors such that these children would benefit from continuing the relationship. (Subd. (c)(1)(A).) The record shows father visited Cordero twice in the two years he was in foster care and father's attorney could offer no evidence Cordero could benefit from continuing the relationship. While father called Ronell regularly, counsel represented father only visited the elder son twice, even though the department provided father with a monthly bus pass for that purpose and Thomasine S. offered to pick father up at the bus station to facilitate visits. While Ronell loves his father, Ms. S. testified she would not prevent father from visiting Ronell. It simply cannot be said that the relationship extant between father and sons "... promotes the well-being of the child[ren] to such a degree as to outweigh the well-being [these children] would gain in a permanent home with new, adoptive parents." (In re Beatrice M., supra, 29 Cal. App.4th at p. 1418.) In this case, these boys have had very little actual contact with their father their entire lives.
Father claims what is in the best interests of the child "is... relative." Not so. Family Code section 7800 declares the welfare and best interest of a child is achieved "`by providing the stability and security of an adoptive home when those conditions are otherwise missing from [the child's life].'" (In re Emily L. (1989) 212 Cal. App.3d 734, 742 [260 Cal. Rptr. 810], quoting from Civ. Code, former § 232.6, the precursor to Fam. Code, § 7800.) The fact is, "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability. ... [¶] ... The parent's interest in having an opportunity to reunify with the child is *1370 balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (In re Marilyn H. (1993) 5 Cal.4th 295, 309 [19 Cal. Rptr.2d 544, 851 P.2d 826], italics added.) "Childhood does not wait for the parent to become adequate. [Citation.]" (Id. at p. 310.)
In this case, reunification services were terminated and father does not challenge the determination to terminate such services. The overwhelming and clear evidence shows father will never be able to provide these children with permanency and stability. In the end, "... there must be a limitation on the length of time a child has to wait for a parent to become adequate" to the task of parenting. (In re Marilyn H., supra, 5 Cal.4th at p. 308.)
Finally, father argues "Due process places a limit on the state's ability to interfere with extant [family] relationships...." The contention is unavailing. Our Supreme Court has recently described the objective of the dependency scheme. In In re Marilyn H., supra, 5 Cal.4th at page 307, the court explained, "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.] The state's interest requires the court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order."

DISPOSITION
The judgment is affirmed.
Klein, P.J., and Croskey, J., concurred.
A petition for a rehearing was denied April 26, 1996.
NOTES
[1] Lareal is not a subject of this appeal.
[2] Hereinafter, all statutory references shall be to the Welfare and Institutions Code, unless otherwise noted.
[3] Mother concedes visitation with Ronell was not indicated because of the severe detriment to him. (§ 361.5, subd. (e)(1).)
[4] The court appears to have issued this order as an accommodation because earlier, the department had concluded the paternal grandparents were not suitable caregivers or monitors. At the request of the court, the department investigated the possibility that father's parents could serve as monitors during father's visits with the minors. In the department's view, the paternal grandparents could not be approved as monitors because they are also mentally retarded and do not appear to understand the responsibilities of a monitor. Paternal grandfather is slightly higher functioning than the grandmother but he has been arrested several times for drunk driving, hit and run, and exhibiting a firearm. In short, the department stated, the paternal grandparents lack life skills necessary to care for the minors and "`... have demonstrated extremely poor insight and judgment failing to protect or take appropriate action to protect minor's [sic] safety and well being.'"
[5] Finally, mother does not challenge the reasonableness of services provided to extended family members or foster parents as provided in section 361.5, subdivision (e)(1)(D).
[6] Moreover, mother never complained to the department or to the court about the reunification services provided. Indeed, when the court asked whether "there [are] any problems I need to know of?" Mother's attorney responded, "Not regarding mother." It was only when the court set the hearing for permanent placement that mother noticed Cordero had not visited her. If mother "felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan: `"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." [Citations.]'" (In re Christina L. (1992) 3 Cal. App.4th 404, 416 [4 Cal. Rptr.2d 680].)