Filed 7/11/13  Jorge T. v. Super. Ct. CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JORGE T.,<br><br>       Petitioner,<br><br>   v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>       Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>       Real Party in Interest. | F067153<br><br>(Super. Ct. Nos. 516366, 516367 & 516368)<br><br>**O P I N I O N** |

### THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Dependency Advocates of Stanislaus County and Nadine Salim, for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Robin Gozzo, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*  Before Wiseman, Acting P.J., Levy, J., and Gomes, J.

Petitioner, Jorge T. (father), filed an extraordinary writ petition (Cal. Rules of Court, rule 8.452) regarding his minor children S. T., age seven; Kaitlyn T., age five; and Jacob T., age one. Father seeks relief from the juvenile court's order issued at the six-month review hearing terminating his reunification services and setting a Welfare and Institutions Code section 366.26[1] hearing for September 9, 2013. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 18, 2012, a section 300 dependency petition (petition) was filed in which the following was alleged: On July 16, 2012, police went to the home of Brandy D. (mother) in response to a 911 call placed by one of mother's neighbors. Upon arriving at mother's home, police found the body of Stephanie T. (Stephanie), which was in the initial stages of decomposition.[2] The house "was dirty with animal feces, cats, garbage and the smell of urine throughout the house." Mother told police the following: She had been ill "during the weekend," and "after her period of convalescence," she awoke and found Stephanie dead. The previous night mother and a friend had used methamphetamine. Mother "was under the impression" her two oldest daughters, ages six and four, were taking care of Stephanie and Jacob, age six months.

The detention report, filed July 18, 2012, states that in May 2012, father was arrested for "conspiracy to commit a crime" and for illegally entering the United States in violation of federal immigration law, and deported to Mexico.

On July 19, 2012, the court ordered the children detained and set a jurisdiction/disposition hearing for August 15, 2012. On that date, the court appointed counsel to represent father, who was not present in court, and continued the hearing.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Although it was not specifically alleged in the petition, it is not disputed that Stephanie was mother's daughter. The autopsy report indicates Stephanie was a little over two weeks shy of her third birthday at the time of her death.

2

After several more continuances, the hearing, for which father was not present, was held on October 22, 2012, at which time the court found the allegations of the petition true, found father to be the presumed father of the children, ordered reunification services granted to father and denied to mother, and adopted and approved a case plan.

Following a contested six-month review hearing on April 9, 2013, the court, after finding that reasonable reunification services were offered to father, terminated reunification services to father and set a section 366.26 hearing for September 9, 2013. The filing of the instant writ petition followed. Neither party requested oral argument.

## DISCUSSION

Father contends the juvenile court erred in finding that reasonable reunification services had been provided. We disagree.

### *Legal Background*

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.] '"In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact."' [Citation.]" (*In re Alvin R*. (2003) 108 Cal.App.4th 962, 971 (*Alvin R*.).) "We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.] 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must

3

determine if there is any substantial evidence--that is, evidence which is reasonable, credible and of solid value--to support the conclusion of the trier of fact. [Citations.]' [Citation.]" (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 971.)

"'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'" (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599.) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult .…'" (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 972-973.) The effort must be made "in spite of the difficulties of doing so or the prospects of success." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.) "The adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 (*Ronell A.*).) In assessing the reasonableness of reunification services, the juvenile court evaluates not only the agency's efforts to assist the parent in accessing the services, but also the parent's efforts to avail himself or herself of the services. (*Ronell A.*, *supra*, 44 Cal.App.4th at p. 1365.)

*Additional Background*

At the outset we seek to clarify what is *not* at issue. Father does not challenge the content of the case plan and he implicitly concedes he did not comply with the case plan. Indeed, he states, "compliance became impossible ...." Father's argument is that the Stanislaus County Community Services Agency (agency) did not provide reasonable services because the agency failed to make reasonable efforts to maintain contact with father and, as a result, failed to assist him in complying with the services plan. The agency, he asserts, "refused to [make efforts to contact father] in a manner calculated to

4

actually reach him even though they had information that their efforts were not successful through no fault of the father."

To address father's contentions, we must first summarize the evidence regarding attempts of the agency and father to make contact with each other. We find it useful to separate the contacts and attempted contacts into three periods: (1) July 17, 2012,[3] to September 20, during which time there were both attempted and successful contacts; (2) post-September 20 to February 26, during which time there were numerous attempts by the agency but no contacts; and (3) February 27, when father contacted the agency for the first time since September, through April.

*July 17 to September 20*

During the period of July 17 to September 20, there were repeated attempts by the agency and father to contact each other. The detention report filed July 18 states that on July 17, Social Worker (SW) Petra Orozco-Sandoval called what the agency believed to be a possible local telephone number for father and spoke to father's sister-in-law who explained that she and her husband had not seen father for over one year and believed he had been deported to Mexico.[4] On July 19, Orozco-Sandoval informed SW Cynthia Hujdic by e-mail of the following: She had just spoken to father in Mexico, and he was "aware about what has happened and would like to have the children taken to Mexico." He left a telephone number in Mexico. He said he had last seen his children on May 15. Orozco-Sandoval told father "to wait for a call from a social worker for more information on background checks, etc[.] ...."

---

**3**    All further references to dates of events in July, August, September, October, November and December are to dates in 2012. All further references to events in January, February, March and April are to dates in 2013.

**4**    The record indicates father's brother and sister-in-law lived in Merced.

The jurisdiction/disposition report prepared and filed August 10 details further contacts and attempted contacts in July and August. Father left two different telephone numbers on Orozco-Sandoval's voice mail. On July 24, Orozco-Sandoval called both numbers. One was busy and when she called the other one there was no answer and no message-leaving capability. On July 26, father attempted to reach Orozco-Sandoval, who was out of the office. On August 3, an international call "was received." It was "believed to be from [father]," but due to "low volume" the message could not be heard. "However, a phone number was identified on the voice over internet protocol ...." On August 8, SW Maria Pasillas called father "at a number he had used in the past," and left a voice mail message.

On August 9, Karla Self, identifying herself as an agency "family finding researcher," sent an e-mail to the Mexican consulate in Sacramento (consulate) requesting assistance in locating father. The August 10 report stated there had been no response as of August 10.

On August 10, according to an e-mail from Pasillas to Hujdic, Pasillas received an e-mail from father, in which father "reported to have found (no name) a place to take [domestic violence] classes," and that he "has an appointment with a psychologist ...."[5] He provided an e-mail address: cepavi@col.gob. The e-mail contained what is designated by a handwritten notation as the "newest ph #," followed by another number which is identical except for two transposed digits.

---

[5] The case plan requires, inter alia, that father "attend and complete a 52-week domestic violence class as approved of by the social worker," "attend general counseling in a program as approved of by the social worker," and "attend and complete a parenting education program as approved of by the social worker." However, although this email suggests appellant was aware of what the case plan, once adopted, would contain, as indicated earlier, the case plan was not adopted and approved until more than two months after this contact, on October 22.

6

An "Addendum Report" prepared by Hujdic and filed August 24 (August 24 report) shows an address for father—C.P. 28047, 1546 Colonia las Torres, Colima, Mexico[6]—and what appears to be yet another international telephone number.

An "ADDENDUM REPORT" prepared by Hujdic and filed October 17 and her activity log detail the following events in September:

On September 10, father telephoned and left a voice mail message with his "new" telephone number. It was the same number he left on August 14. Pasillas called the number twice; each time "the phone sounded busy."

On September 13, Orozco-Sandoval received a call from father, in which he left the same telephone number he left on September 10. An e-mail from Orozco-Sandoval to Hujdic, a copy of which is contained in the record, states father told Orozco-Sandoval that "he has started taking one of the classes that were ordered for him" and "asked if someone can call him as soon as possible."

On September 20, father "returned a call to Swkr Pasillas." During what appears to be an extended conversation, he told her he "did not receive the packet [the agency] mailed him ...." Pasillas "recited" to father the address the agency had for him, but father "couldn't even say that the [address] ... recited to him was not the right one." Father did say "the nearest city to his town is Colima, Colima Mexico." Father said he was taking "dv classes" from an entity called Cepavi, but "he could not give [Pasillas]" the location or telephone number of Cepavi. Pasillas "reminded" father that the agency needed this information in order to "verify that he is taking his classes, what the curriculum is, etc."

---

**6** As best we can determine, the record does not reveal from what source the agency obtained this address.

Pasillas told father to "get in touch w/DIF,"[7] and that the agency had e-mailed DIF "asking for their assistance" but had not received a reply. Pasillas asked father to "get back" to the agency and advise of his address, an "alternate" telephone number, and "other info as to where he is taking classes, what type, a [telephone number and address], etc."

*Post-September 20 to February 26*

In an October 1 log entry, SW Hujdic stated the following: Karla Self had attempted "monthly contacts" with the consulate, but had received no response. Hujdic telephoned the consulate and left a voice mail message.

In an October 1 log entry, SW Hujdic stated she sent an e-mail to the consulate in which she requested information regarding father, and she was attempting personal contact with the consulate because Self "has sent requests each of the last couple of months with no response from consulate .…" She stated that father lives in "Colima Colima Mexico" and she asked for "help as we would need [father] to complete a case plan that has many service components." She asked, "Which DEF [*sic*] office would I contact and how would I go about doing so ... [?]"

On October 11, Hujdic sent an e-mail to the consulate in which she stated the following: The agency was "attempting to work with a DIF local to the father"; father "lives in Colima, Colima Mexico"; the agency had made "numerous" unsuccessful attempts "to reach a consulate member"; and the agency was "still at a loss as to who to contact at which DIF office."

On October 22, following the jurisdiction/disposition hearing, the clerk of the juvenile court mailed to father a notice advising him, "You must make meaningful efforts

---

[7]     "DIF is the acronym for Desarrollo Integral de la Familia, a Mexican social services agency dealing with family matters." (*In re E.M.* (2012) 204 Cal.App.4th 467, 472, fn. 3.)

to comply with the Reunification Plan, a copy of which is served herewith, prior to the next review hearing."  The notice was mailed to the same address in Colima, Mexico set forth in the August 24 report prepared by Hujdic.

In a status review report filed February 25 (February 25 report), SW Shahbazian stated the following regarding the agency's attempts to contact father from October through January:

On October 25 she and Hujdic mailed "a letter, case plan to [father] in Mexico."

On November 28, Shahbazian "e-mailed, faxed and mailed a request to the Mexican Consulate requesting assistance ... in locating the father and providing appropriate services to him in Mexico."

November 29, SW Victor Pena "attempted contact with [father] by calling him at several phone numbers the agency had obtained previously."

On November 30, Shahbazian "mailed [father] a letter with his case plan both written in Spanish."  Also on November 30, a "Family Reunification Clerk" faxed a letter to the consulate and called the consulate and "left a message."

On December 10, the same clerk sent a fax to the consulate and called the consulate, "again leaving voice messages requesting a return call ...."

On December 13, Shahbazian "mailed a letter and case plan in Spanish to [father] in Mexico."

On December 17, Pena "attempted to contact [father] in Mexico by calling him at several phone numbers that the agency had obtained previously."

On December 20, Shahbazian "attempted to contact the Mexican Consulate ... by mail, fax and e-mail."

On January 23, Shahbazian "mailed [father] a letter with his case plan written in Spanish."

9

On January 25, Pena "attempted to reach [father] by phone by calling him at the numbers that the agency had obtained previously."

On January 29 the family reunification clerk again "faxed and called the Mexican Consulate regarding assistance in this matter."

On January 31, Shahbazian, after receiving a voice mail message from the consulate, returning the call and speaking with someone at the consulate, sent an e-mail that included the "contact information" the agency had for father, what information the agency had that "could assist the consulate in locating [father]," and "the case plan to assist in finding appropriate services for [father] in Mexico."

At the six-month review hearing, Pena testified that beginning around the end of November, "approximately every month" he "sent" to father "a translated copy of the case plan in addition to a letter ...."[8] When asked to what address he sent the letters to father, he responded that his March 27 log note indicated an address—"C.P. 28047 1546 Colonia Las Torres Colima, Colima, Mexico 523125955841''—but he was "not sure if that's the same address that [he] used for the letter .…"

On February 10, father sent an e-mail to the consulate in which he stated, "I received your message" and that he would be contacting his attorney regarding what he (father) "need[ed] to do for the reunification with [his] children."

On February 11 the consulate responded to father by e-mail, stating "we will be working together with the Delegation of SRE in Colima in regards to the reunification of your children."

Attached to an "Addendum Report" prepared by Shahbazian and filed March 5 (March 5 report) is a fax to Shahbazian, dated February 22, from the "Consul of Protection and Legal Affairs" (Consul of Protection) at the consulate, that provides a

---

[8] All references to testimony are to testimony taken at the six-month review hearing.

mailing address, telephone number and e-mail address for father, and states, "our coworkers in Colima informed us that through state DIF [father] is starting some services soon (parenting classes, counseling addressing ... abandonment and his children's emotional needs and substance abuse assessment.)" The address provided is "Republica de Honduras #1546[,] Col. Las Torres[,] Colima, Colima, Mexico 28047[.]" The March 5 report also states that SW Pena, apparently on February 22, "sent an email to [father] and attempted phone contact."

Pena testified that in the February 22 e-mail, he asked father to provide information including the names of all adults living with him, the name of his employer, and the telephone numbers and addresses of "[w]ho [father] was using for drug treatment, parenting classes, domestic violence programs, and ... drug testing and NA or AA assistance."

On February 25, father sent an e-mail to "Attorney German," in which father asked for "any type of information regarding where I need to go for the therapy's [*sic*]." Father also stated he was "thinking of visiting your office" on the upcoming Wednesday, "which is my day off work."

On February 26 and 27, according to the March 5 report, Shahbazian "contacted [the Consul of Protection] ... requesting follow up information including contact information for the local DIF," but as of March 5 she had "not received any further contact from [the Consul of Protection] regarding ... [father]."

*February 27 through April*

The March 5 report further states that on February 27, father "responded to Social Worker Pena by e-mail sent from his iPhone." An interpreter testified that in that e-mail father provided the name and address of his employer—a car wash—and the names of the persons living with him, and stated he had not "started ... classes" because he was

11

"waiting for ... State Department ... of Republic of Mexico to refer [him] to the organization that will help [him]."

On March 8, the consulate official sent an e-mail to Shahbazian stating he had "sent a request to our agency in Colima in order to get the information of the DIF office who's going to handle this case ...."

Pena further testified to the following: On March 27 he "emailed [father] his case plan" and sent father a "letter explaining, again, what the case plan was and the importance for him to contact [the agency]" and providing the agency's "contact information"; he "also emailed [father] on [March] 28th"; and on March 29, Pena "attempted to contact [father]" by telephone. On April 4, Pena received a voice mail message from father, "asking about his case" and providing a telephone number to return the call. Pena "called that number back three times and was unsuccessful in reaching [father]."

*Problem in Communicating with the Consulate*

On February 21, SW Shahbazian e-mailed an official at the consulate and stated she had e-mailed the consulate two weeks previously and had not heard back; she was "really bothered ... that [she] didn't get [the official's] e-mails or the e-mail from [the official's] supervisor"; and wondered if those e-mails "were possibly filtered as spam[.]" Other agency staff log entries and e-mails indicate that thereafter an agency "Information Systems" worker conducted an investigation, determined consulate e-mails were not reaching the agency due to a "firewall" setting, and "resolved [the] issue" on March 6.

*Shahbazian's Testimony*

Shahbazian, called as a witness by father, testified to the following: She became aware that the address in Mexico the agency had for father was not correct when, beginning "[p]robably in December or January," the letters sent to father at that address were returned as undeliverable. Nevertheless, letters to father were sent to him at that

address until the agency obtained a new address for him because until that time, the address to which the letters were sent was the only one the agency had for father.[9]

Shahbazian had spoken to another social worker "who [had] had cases that involved DIF before ...."  Shahbazian had been "'attempting to work with the local DIF'" but she and the agency had been unable to learn "who the local DIF is ...."  She was advised by a co-worker to contact DIF "via the Consulate."  When asked, "wouldn't it have made sense to try to contact DIF directly," she responded:  "That's not what I was instructed to do as our procedure."

Even though she had been sending letters to father at a Colima address, she did not "try to Google the DIF in Colima" because, she testified, "I don't know that he is in Colima for sure, because we haven't had contact from him."

When asked if she would have called the "local DIF" if she had a telephone number to call, she responded:  "Once I knew where he was living, then I would -- and I had a phone number for the local DIF, and I was told that he was -- I mean, I guess.  I don't know.  I was waiting for information from the Consulate at the last point, so ...[.]"

When asked if prior to the consulate providing her with contact information for father she had "sent letters to the Consulate asking for assistance in locating the father," she responded:  "I sent letters, I phone called, I faxed, and I e-mailed the Consulate every month."

### Father's Offer of Proof

Father made, and all counsel accepted, an offer of proof that if called to testify, he would testify to the following:  "the first line of his address is Republica ... De Hondorus [*sic*]"; he "started contacting External Relations, an Agency in Mexico, [in] November of

---

[9]     As indicated earlier, the record shows the agency obtained a different address in February after father contacted the consulate.

13

2012"; "he contacted his local DIF on his own"; "he ... contacted the Mexican Consulate on his own"; "He was waiting ... [for] the Mexican Consulate to respond to him so DIF would accept his case," and "two months after that, the Consulate told him to go to DIF"; one month after that "he was accepted and started classes"; he "is doing," and he "has done," four "combined parenting and domestic violence classes"; and "he did not contact the Agency ... because he thought the Mexican Agency was supposed to do that."

*Analysis*

As indicated earlier, father contends the agency did not provide reasonable reunification services because the agency failed to make reasonable efforts to contact him and, as a result, failed to assist him in complying with the case plan. We disagree.

The record contains evidence of the following: The agency began attempting to contact father immediately after Stephanie's death, and after some unsuccessful attempts, contact was made on September 20, when father and SW Pasillas spoke by telephone. However, during that conversation, father was unable to provide the agency with his address, and when Pasillas recited the address the agency had for him, father could not confirm it was his. The best father could do was state that he was living near the city of Colima in Mexico. Pasillas directed father to "get back" to the agency and provide his address and an alternate telephone number.

Father contacted the consulate on February 10, but he did not contact the agency again until February 27, more than five months after Pasillas directed him to do so and provide his contact information. In that period when the agency was getting no help from father in establishing contact, the agency made numerous, regular attempts to find father by attempting to contact the consulate through various means, mailing father material at the only address the agency had for him and placing telephone calls to various numbers the agency had for father.

14

As indicated above, when evaluating the reasonableness of reunification services, we consider not only the agency's efforts to assist father in obtaining services, but also father's efforts to avail himself of services. (*Ronell A.*, *supra*, 44 Cal.App.4th at p. 1365.) Here, the juvenile court reasonably could have concluded that for a critical five-month period, father's efforts were nonexistent. Father's offer of proof does not establish otherwise. The court was not compelled to believe that father believed some unspecified "Mexican agency"[10] was going to provide the Stanislaus County agency with the information Pasillas asked father to provide. We note that father's offer of proof does not indicate on what basis father formed this belief. Moreover, the offer of proof suggests that the first Mexican agency he contacted was External Relations and that he did not contact that agency until November. Thus, his offer of proof contains no support for the claim that he thought someone else would contact the agency in Stanislaus County on his behalf during the period from September 20 to the unspecified date in November when, according to father, he contacted External Relations.

On this record, given the evidence of the agency's efforts to contact father and father's failure for a five-month period to contact the agency, we conclude that the juvenile court could reasonably find that it had been proved by clear and convincing evidence that the agency had "made reasonable efforts" (*Alvin R.*, *supra*, 108 Cal.App.4th at pp. 972-973) to contact father and assist him in complying with the case plan.

Father challenges the adequacy of the agency's efforts to contact him. He asserts that in his September 20 telephone conversation with SW Pasillas, in asking father to confirm the address the agency had for him, recited both the address and the telephone number in Mexico that the agency believed was his. The agency was remiss, father

---

**10**    Father's offer of proof referred to three entities that could be described as agencies: The Consulate, External Relations, and DIF. It is not clear which of these is "the Mexican agency" referred to in his offer of proof.

suggests, because the inclusion of the telephone number confused him and was the reason he did not confirm the address was his.

The record does not support the claim that Pasillas incorrectly recited father's address to him. Father asserts that Hujdic's August 24 report incorrectly indicates father's address by including in the notation of the address a numerical sequence which is actually a telephone number, and he suggests that this is what Pasillas recited to him. However, assuming the August 24 report was the source of Pasillas's information regarding father's address, that report, although it contains both the address and the numerical sequence, does so under the heading "**Address/Phone**." This does not suggest, much less compel the conclusion, that Pasillas incorrectly included a telephone number in the address she asked father to confirm. Moreover, and more fundamentally, even an incorrect recitation of an address could not be expected to prevent father from providing his correct address, if he knew it, nor prevent him from conveying that information to the agency at some point in the five months that followed.

Father also finds it "remarkably telling" that SW Shahbazian testified that even if she had a number for the local DIF in Colima she does not know if she would have called it. He argues, "There can be no reason for this other than the Agency did not wish [father] to reunify."

We disagree. Shahbazian's testimony on this point does not compel the conclusion that the agency deliberately, or would have deliberately, sabotaged its own efforts to find father and assist him in complying with his case plan. From the evidence of the agency's many attempts to contact father, the court reasonably could have concluded the agency did not act in bad faith as father claims.

Father also criticizes the agency's efforts to make contact with him on three other bases. First, implying that had the agency been able to make contact with the local DIF office in the city of Colima, the agency would have discovered his address, he criticizes

16

the agency's efforts to locate a DIF office in Colima, asserting the agency was remiss in failing to contact other DIF offices with which it had worked in the past and in failing to utilize an internet search engine. He challenges Shahbazian's explanation that notwithstanding that the agency's only address for father was in Colima, she did not "'Google'" DIF in Colima because she did not know whether father actually lived there.

Second, father argues that the agency's efforts to find him by contacting the consulate were unreasonable because the agency "did nothing to change its ways" when it received no reply from the consulate "after months of effort." He attributes the delay in the agency's failure to obtain information from the consulate, in large part, to a firewall setting in the agency's own communications system which prevented e-mails from the consulate from reaching the agency.

Finally, referring to the evidence in an e-mail on August 10 that he provided the agency with an e-mail address—cepavi@col.gob—and that on September 20 he told Pasillas he was taking a domestic violence class at "Cepavi," father notes there is no evidence the agency ever sent an e-mail to the address given.

These matters do not establish that the court erred in terminating reunification services. The court reasonably could have concluded that although in an ideal world the agency could have made more and/or better efforts to make contact, its efforts here were reasonable under the circumstances. The factors cited by father militate in favor of the opposite conclusion, but, as indicated earlier, "we may look only at whether there is any evidence, contradicted or uncontradicted, which supports the trial court's determination" and "[w]e must resolve all conflicts in support of the determination." (*Elijah R. v. Superior Court*, *supra*, 66 Cal.App.4th at p. 969.) As also indicated earlier, there was ample evidence that the agency worked long and hard to try to contact father, and that father, though instructed to get back to the agency with contact information, did not do so

17

for five months.  On this record, we conclude substantial evidence supports the court's determination.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is final forthwith as to this court.