Filed 4/12/16  In re Q.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re Q.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>S.T. et al.,<br><br>      Defendants and Appellants. | C080485<br><br>(Super. Ct. Nos. JD234681, JD234682 ) |

S.T., mother, and D.S., father of Q.S., appeal from orders of the juvenile court terminating their parental rights.  (Welf. & Inst. Code, §§ 366.26, 395[1].)  M. Johnson, father of M.J., is deceased.  Father joins mother's argument that the court erred in

---

[1]      Undesignated statutory references are to the Welfare and Institutions Code.

terminating parental rights because mother established that the beneficial parental relationship exception applied. We conclude mother has not met her burden of establishing a beneficial parental relationship with either minor. We affirm the juvenile court's orders.

FACTS

In May 2014, the Sacramento County Department of Health and Human Services (Department) removed two-year-old Q.S. and newborn M.J. from mother's custody due to M.J. and mother testing positive for methamphetamine at the minor's birth. Mother previously failed to reunify with two older half siblings of the minors. The older half siblings were adopted in 2011. Following the detention, mother tested positive for alcohol and was told not to continue to provide breast milk for M.J.

The minors were placed together in a foster home. Q.S. had issues with speech and toilet training. Mother had twice-weekly supervised visits. Q.S. tended to be quiet after visits although she had screamed for an hour after the first visit. By October 2014, visits were going well. Mother interacted with the minors and visits were positive and appropriate. The court sustained the petitions and ordered services for mother.

The six-month review report in April 2015 stated Q.S. was continuing to have toilet training issues and language problems. M.J. was doing well with no apparent delays. Mother attended all supervised visits. In December 2014, unsupervised visits began. After the first unsupervised visit, there was some concern about mother feeding the baby the required formula. After another unsupervised visit, there was a concern mother was not properly buckling the baby into the car seat. This was discussed with mother and no further concerns were noted. In February 2015, mother tested positive for methamphetamine, amphetamine and marijuana and visits returned to a supervised format. The report recommended termination of services due to mother's lack of

2

progress. Because the minors were not placed in an adoptive home, the Department made a referral for home finding. At the review hearing, the court adopted the Department's recommendation.

A memo in August 2015 indicated mother had a positive test for methamphetamines in April 2015 and continued to struggle with sobriety and substance abuse treatment. The Department was still in the process of home finding for a foster/adoptive placement.

The assessment for the section 366.26 hearing stated mother attended weekly supervised visitation and was positive and appropriate in visits. After visits, the minors transitioned easily back to the foster home with no behavioral problems. Mother also called once or twice a week, but conversations were brief because Q.S. had no interest in talking to her and M.J. was nonverbal. The Department concluded that, while mother had visited regularly and the minors appeared to enjoy them, visits were primarily friendly and playful occurrences. There were no significant health or developmental concerns about either minor. The Department had located one viable family as a prospective adoptive placement. An addendum stated the couple was interested and a meeting with the minors was planned.

An addendum in October 2015 stated the minors were placed in a potential adoptive placement in September 2015 after several preplacement visits including overnights. The minors appeared happy and were doing well. The foster agency confirmed that, despite mother's complaints and accusations, the minors appeared well cared for. The social worker observed a visit and found the minors were well dressed, smiling, playful, and engaged before mother arrived. When mother arrived, Q.S. stopped playing and smiling and shut down. Mother did not smile or hug the minors but began gruffly questioning them. Mother asked Q.S. if she was happy where she was living and

Q.S. nodded yes. Q.S. shook her head no when mother asked if she wanted to live with her. Mother ignored M.J. for most of the visit. Neither minor was distressed at the end of the visit. Q.S. told the foster agency social worker and the foster father she did not want them to call mother for her and did not want to talk to her. The foster father had noticed Q.S. to be withdrawn after a visit and it took a day for her to recover. Visitation notes showed the minors had no reaction to the visits. Q.S. played independently and did not engage with mother although mother was overall appropriate in visits. The Department assessed, based on interaction during visits, there was not a significant parent-child bond.

At the section 366.26 contested hearing, no evidence was offered other than the evidence contained in the Department's reports. Opening arguments were waived and counsel proceeded directly to closing arguments. After hearing argument, the juvenile court found the minors were likely to be adopted. The court stated: "It is clear that the parents love their children, that the mother loves her children, that they are important people in her life, but she has been nothing but a visiting parent for a long time for these children; and visits, even positive, are not like being a mom. When push came to shove and she had to make hard choices in her life in order to prove to herself, to the Court, and to these children that they are the most important things in her life and that she was willing to do whatever it took to be their mother, she was unable to do that." Finding no exception applied, the court adopted the Department's recommended findings and orders, terminating parental rights and freeing the minors for adoption.

DISCUSSION

Mother contends she established the beneficial parental relationship exception to the preference for adoption and the juvenile court should not have terminated her parental rights. Q.S.'s father, D.S., joins mother's argument.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1373; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)

Termination of parental rights may be detrimental to the minor when: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Even frequent and loving contact is not

sufficient to establish this benefit absent a significant positive emotional attachment between parent and child. (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.)

The evidence regarding mother's visitation with the children after they were removed supports the juvenile court's conclusion mother's role was that of a friendly visitor and not an important parental figure. Notably, mother did not present any evidence, documentary or otherwise, at the section 366.26 contested hearing to show she had a beneficial parental relationship with either child. All the evidence comes from the Department's reports.

As to M.J., who had never lived with mother and had seen her only at visits, there was no significant parent-child relationship. During visits, M.J. wandered around with mother picking her up a few times and holding her on her lap. At the end of visits, mother would hug M.J. and each said goodbye. M.J. did not show any distress at the end of visits and made an easy transition back to her foster placement.

Q.S. had lived a significant portion of her life with mother, but, during that time was subjected to neglect due to mother's substance abuse. Mother was appropriate in visits and for a brief time earned the privilege of unsupervised visitation. However, there is no evidence Q.S. looked forward to visits. Q.S. played independently during visits and did not interact with mother at visits, despite mother's appropriate behavior and attempts to engage the minor. After visits, the foster parents reported Q.S. was withdrawn for about 24 hours before returning to being happy and playful. Later, after unsupervised visits were suspended, Q.S did not want to talk to mother on the telephone and did not want to live with her.

The juvenile court correctly determined mother did not meet her burden of showing she had a beneficial parental relationship with either minor that would outweigh the benefits of permanence and stability adoption could provide.

## DISPOSITION

The orders of the juvenile court are affirmed.

_____/s/_____
HOCH, J.

We concur:

_____/s/_____
MAURO, Acting P. J.

_____/s/_____
MURRAY, J.