Filed 11/6/13  In re T.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re T.B. et al., Persons Coming Under the Juvenile Court Law. | |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>P.P. et al.,<br><br>        Defendants and Appellants. | C072587<br><br>(Super. Ct. Nos. J35301, J36046) |

P.P., the mother of the minors T.B. and P.H., and T.B.'s father J.B, appeal from the juvenile court's orders terminating parental rights and denying mother's petition for modification.  (Welf. & Inst. Code, §§ 395, 388, 366.26; unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code.)  Mother contends the juvenile court erred in not finding the sibling relationship exception to adoption.  Father contends there was a failure to comply with the notice requirements of

1

the Indian Child Welfare Act (ICWA).  (25 U.S.C. § 1901 et seq.)  Father and mother join each others arguments.  We affirm the orders of the juvenile court

### FACTS AND PROCEEDINGS

In May 2010, three-year-old T.B. was placed in protective custody after mother left her with people who did not know T.B. or her parents.  Mother admitted abusing the drug Dilaudid and testing positive for methamphetamine.  Later that month, the Butte County Department of Employment and Social Services (the Department) filed a dependency petition (§ 300) alleging T.B. was at substantial risk of harm due to domestic violence between mother and her boyfriend, mother's drug use, mother leaving T.B. with unrelated adults, and father's incarceration.

The minor was detained at a May 2010 detention hearing.

The juvenile court inquired into the minor's possible Indian heritage at the detention hearing.  Mother told the juvenile court she had no Indian heritage, and did not know if father had any.  The paternal grandmother told the juvenile court the paternal grandfather "claims" he has Indian heritage, "but I'm not sure."  He lived in Alaska, and the paternal grandmother did not know what type of Indian ancestry he claimed to have.  Asked if she could provide contact information for the paternal grandfather, the paternal grandmother replied, "I can try.  It will be through my daughter, but I can."

In a June 2010 disposition report, the Department said mother and father moved from Alaska to California in 2009.  They had two children, T.B., and  six-year-old B.B.  Father moved back to Alaska with B.B.  Father was subsequently incarcerated, and B.B. was placed with relatives in Alaska who would not return him to mother.

The juvenile court sustained the petition in May 2010 and ordered reunification services for mother in June 2010.

The Department sent ICWA notices to the Secretary of the Interior, the Bureau of Indian Affairs, and the three Cherokee tribes.  The notice included information about the

parents and paternal grandmother, but no information regarding the paternal grandfather. In June 2010, the Cherokee Nation sent a letter stating T.B. was not eligible for membership in the tribe. The letter listed mother, father, T.B., and the paternal grandmother as the persons through whom potential tribal membership was traced. In July 2010, the Eastern Band of Cherokee Indians sent a letter stating T.B. was not eligible for membership based on the information provided by the Department.

The juvenile court found the ICWA did not apply to the minor's case at an August 2010 hearing.

The Department filed a petition for modification (§ 388) in October 2010, requesting T.B.'s return to mother with family maintenance services after mother completed an inpatient substance abuse program and actively participated in her services. The juvenile court granted the petition in November 2010.

T.B.'s half sister P.H. was born in August 2010. T.B. lived with mother, mother's boyfriend R.H. and P.H. Her brother B.B. moved in with the family in December 2010.

The Department filed a supplemental petition (§ 387) on behalf of T.B. in September 2011 alleging mother failed to arrange for adequate shelter for T.B. after telling the Department she would be incarcerated for one to six months. According to the detention report, mother did not fully participate in services, failed a drug test three separate times, and tested positive for opiates and oxycotin. Father remained in Alaska, where he had pending felony charges. T.B. was detained by the juvenile court later that month.

The Department also filed a dependency petition (§ 300) for P.H. alleging similar grounds as in T.B.'s section 387 petition and her father's incarceration. The juvenile court detained P.H. a few days later. After P.H.'s father denied having Indian heritage, the juvenile court found the ICWA did not apply to her.

The juvenile court sustained the petitions in October 2011.

3

A December 2011 disposition report related T.B.'s wish to be placed with her brother B.B. and her paternal grandmother. She consistently asked when she was going to get to live with them. T.B. and P.H. were placed in the same foster home and share a strong bond with each other. The Department recommended denying reunification services for the parents.

Father's first appearance before the juvenile court was by telephone in February 2012. Regarding his possible Indian ancestry, father told the juvenile court: "Only thing I do know is that I have a little bit of Indian, like Cherokee Indian, a quarter on my dad's side. They are going to send me what they call a background, like a family history brochure thing so I can fill it out and call up my family, have them help me fill it out and send it back to the courts."

Asked to clarify his statement, father replied, "Alls I know, like I said, is I know I am half Italian, and I have German, and a quarter Indian." Father said the Cherokee was from his father's side of the family. Asked if anyone is a member of a tribe, father said, "I don't think so. I don't think that would fall under, do you know what I mean? I am not positive on that, but I don't think so. I do believe I have done a questionnaire on that once already, and determined it wouldn't fall. I wouldn't go under that status of the native thing, you know, of the Indian tribe thing."

Based on the information before it, the juvenile court reconfirmed its prior ruling that the ICWA did not apply.

Following a contested dispositional hearing, the juvenile court denied services and set a section 366.26 hearing.

In June 2012, mother filed section 388 petitions to return T.B. and P.H. with family maintenance services.

The June 2012 section 366.26 report said T.B. had six placements and P.H. four since during the dependency. They were in the same foster home since February 2012. They were thriving there, formed a strong bond with the family, and the foster parents

4

were "very committed" to adopting them. The family gave "great thought" over the possibility of contact with family members, including B.B., after adoption. They were definitely open to post-adoption contact.

Mother maintained visitation and brought B.B to many of the visits. However, B.B. did not go on as many visits in the last two months before the report.

The report also noted the juvenile court sustained a nondetained petition with family maintenance as to B.B. in March 2012. B.B. was later detained and placed in foster care. He is not a party to this appeal.

An adoptability assessment was filed by the California Department of Social Services (CDSS). T.B. and P.H. had strong attachments to the potential adoptive family. Having been separated for only six days, T.B. and P.H. enjoyed "a significant, healthy, mutually beneficial sibling relationship" and should remain together.

The reporter observed a visit between T.B., P.H., B.B., and mother. The observer saw no "direct interactions" between T.B., P.H., and B.B. The children greeted each other when directed to do so. P.H. competed for mother's attention and the snacks she provided. T.B. was quiet and appeared withdrawn. T.B. and P.H. reportedly do not ask about B.B., and did not show distress when he did not attend visits.

The reporter concluded the possible interference with the sibling relationship caused by terminating parental rights would not be detrimental when compared to the benefit of the permanence gained by adoption. CDSS accordingly recommended terminating parental rights.

Mother filed a bonding study written by psychologist Dr. Claire Fields. Dr. Fields spent over three-and-one-half hours observing T.B., P.H., and B.B. interact each other, their grandparents, mother, and three social workers. She found the children "seemingly happy to be together." T.B. and B.B. "seem to read one another's emotional state." As an example, "while engrossed in a coloring project in opposite ends of the room, when [they] looked up simultaneously caught each other's eyes and smiled before going back

5

to work on their project." Looking at the social worker's services logs, Dr. Fields found T.B. and B.B. spent a majority of their visits together and were happy to see each other. Both children were also very protective of their little sister P.H.

Dr. Fields concluded that the three children had "a strong sibling bond." Separation of the children would be detrimental, especially for T.B. and B.B.

Dr. Fields testified about her bonding study at the contested hearing. She reiterated her conclusion that there was a strong bond between the three children. Although T.B. and P.H. lived in the same foster home, living apart from B.B. was a tremendous strain on the sibling relationship as B.B. and T.B. would feel safer if they lived together. Frequent contact was needed to maintain the sibling bond. It was not unusual that detriment from the separation was not yet apparent, as the trauma from the loss normally unfolds in subsequent relationships the child has in elementary school and high school.

Mother testified that B.B. and T.B. wanted to go with each other when visits are over. When she arrived without B.B., T.B. always asked where was her brother.

Father absolutely believed B.B. and T.B. were bonded to each other. They always looked out for and were concerned for each other.

Filippo Pizzuto was the section 366.26 worker in T.B.'s and P.H.'s case. He thought the girls had a connection with B.B. The prospective adoptive parents were willing to support continued contact with B.B., but nothing was written out or formally agreed upon.

The adoptions social worker testified that T.B. does not ask the foster parents for contact with B.B. or ask for him.

The juvenile court denied mother's section 388 request and terminated parental rights.

6

DISCUSSION

I

*ICWA Notice*

Father contends there was a failure to comply with the notice and inquiry provisions of the ICWA.

Congress passed the ICWA "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' " (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195; 25 U.S.C. § 1902.)

A social worker has "an affirmative and continuing duty to inquire whether a child [in a section 300 proceeding] is or may be an Indian child . . . ." (§ 224.3, subd. (a).) Furthermore, if the social worker "has reason to know that an Indian child is involved, the social worker . . . is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information" required to be provided in the ICWA notice. (§ 224.3, subd. (c).)

The ICWA also includes a provision for notice to the child's tribe in any involuntary state court proceeding in which "the court knows or has reason to know that an Indian child is involved . . . ." (25 U.S.C. § 1912(a).) The Indian status of a child need not be certain or conclusive to trigger the ICWA's notice requirements. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 471.) Nonetheless, some information provided by a parent can be "too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children." (*In re O.K.* (2003) 106 Cal.App.4th 152, 157.) In those cases, notice is not triggered. (*Ibid.*)

Father's claim is based on the failure to include any information on the paternal grandfather in the notices sent to the relevant tribes and agencies. He notes the paternal grandmother said T.B. might have possible Indian heritage through the paternal grandfather. Father asserts the juvenile court should have asked the paternal grandmother for father's name or birth date, and the failure of the juvenile court or the Department to ask this question of the paternal grandmother fatally compromised the investigation into T.B.'s possible Indian heritage, thus rendering the notices inadequate.

The ICWA does not mandate a particular form of investigating a child's possible Indian heritage. The Department and the juvenile court were not required to "cast about" for family history information. (*In re Levi U., supra*, 78 Cal.App.4th at p. 199.) Instead, the ICWA requires a reasonable investigation into a child's possible Indian heritage. Here, the paternal grandmother told the court she would provide additional information about the paternal grandfather and the claimed Indian heritage through him if she could. There is no evidence she made good on her promise. Father likewise told the juvenile court he would provide additional information about the Indian heritage claimed through the paternal grandfather, but, like his mother, did not do so. If a relative refuses to give additional information, the duty to inquire ends. (*In re K.M.* (2009) 172 Cal.App.4th 115, 119.)

The Department and the juvenile court could reasonably take the father and paternal grandmother at their word when they promised to give more information about the paternal grandfather. The ICWA does not require an agency or juvenile court to ask additional questions in anticipation of a relative's breach of a promise to provide additional information. Since the notices contained all the information given to the Department, the ICWA's duties of inquiry and notice were satisfied.

8

## II

### *The Sibling Exception to Adoption*

Mother contends the juvenile court erred in declining to apply the sibling exception to adoption.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363.)

Termination of parental rights is detrimental to the child when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the parent opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many

siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.)

The authors of the legislation adding the sibling exception envisioned that its applicability would " 'likely be rare.'  [Citation.]"  (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 950.)  This language has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption."  (*Ibid*.)

The evidence before the juvenile court did not establish the sibling exception.  While the expert said separation from their brother would be detrimental to the minors, she did not recommend against adoption.  In fact, asked if T.B. and P.H. should be removed from the prospective adoptive family to be reunited with B.B., the expert testified:  "If the children cannot go back to their biological family and if the home is a good home and they are attached to the family, then it would probably be detrimental to move them to another placement."  The expert admitted the children were currently showing no harm from separation, and her finding of detriment was based on the minors' future harm from being separated from their brother.  Asked if the idea that T.B. suffered loss from separation from B.B. was speculation, the expert admitted, "Yes.  Based on years and years of research data."  Asked as a follow up, "[f]or which you need more research, more time, and more data in this particular case," the expert replied, "[y]es."

The minors showed no immediate harm during their extended separation from their brother.  The speculative evidence of long-term detriment does not come close to satisfying the heavy burden of establishing the sibling exception to adoption.

DISPOSITION

The juvenile court's orders are affirmed.

        HULL        , J.

We concur:

      BLEASE      , Acting P. J.

      MURRAY      , J.