Filed 6/27/22  In re H.N. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| In re H.N., a Person Coming Under the Juvenile Court Law. | C094921 |
| CALAVERAS COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.N. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. 20JD6278) |

S.N. (mother) and M.N. (father), the parents of the minor H.N., appeal from the juvenile court's orders terminating their parental rights and freeing the minor for adoption. (Welf. & Inst. Code, §§ 366.26, 395.)[1]  The parents contend the juvenile court

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

erred when it found the parents had not proven the beneficial parental relationship exception to adoption. We will affirm the juvenile court's orders.

# I. BACKGROUND

*Detention*

On July 17, 2020, the Calaveras County Health and Human Services Agency (Agency) filed a section 300 petition on behalf of the two-year-old minor alleging he came under the jurisdiction of the juvenile court through section 300, subdivisions (b)(1) and (c).

The petition alleged an episode of domestic violence two days prior when mother blocked father from leaving their home and grabbed his hair. Father responded by hitting mother in the head, leaving a cut. He also pulled mother out of the car causing cuts and abrasions to her arms and shoulder. As a result, father was arrested. Mother and father did all this in front of the minor. Mother stated she "blacked out" during the altercation and did not remember what happened.

The petition alleged the home (which was a camper) was hot, filthy, and filled with hazards for a small child. There were feral cats laying in the debris and clutter, animal feces on the floor, garbage bags of dirty diapers, electrical cords within reach of the minor, pieces of metal and tools on the floor, and numerous flies. There were prescription pill bottles, bags of pills, and marijuana strewn about, all within reach of the minor. A methamphetamine pipe was found in the shed within the minor's reach.

The petition further alleged mother admitted she had untreated mental health issues including bipolar disorder, posttraumatic stress disorder, anxiety, and depression. Mother also admitted the minor was not safe in their home.

The petition further alleged mother and father have substance abuse problems. Mother claimed she used methamphetamine a couple days a week, and father used it daily.

In the detention report, the Agency set forth the above facts and attached photographs showing the filthy and unsafe condition of the home. The report also recited the parents' long history of domestic violence and noted they were already in an open voluntary family preservation case to address domestic violence and home safety hazards. The two most recent prior incidents occurred in 2020. In one, father grabbed mother by the arm while she was holding the minor and started choking her, and, in another, father hit mother in the face.

At the detention hearing, father and mother submitted on the reports. The juvenile court found the agency made a prima facie case and ordered the minor detained. It ordered supervised visitation at the Agency's discretion.

*Jurisdictional/Disposition*

Prior to the combined jurisdiction/dispositional hearing, the Agency filed two reports. In the first report, the Agency reported the minor had been placed in the home where his biological sister lived. The report recapped the original altercation and the parents' long history of domestic violence, substance abuse, and mother's mental health issues. The report stated the parents argue among themselves outside while leaving the minor alone inside the home unsupervised and subject to its filth and many perils.

The Agency reported the minor was a quiet and observant toddler who could not speak and was developmentally delayed in several respects when he was detained. In the interim, he was bonding well to his caregiver and older sister and thriving in placement. He was also making progress in meeting his developmental milestones. He slept well and was adjusting to eating healthier food and snacks.

There had been eight scheduled supervised visits since the minor was detained. Each parent missed three visits, and they were regularly late. When mother missed one of the visits and arrived as it ended, she was told the minor needed to leave. She responded with an escalated and emotional response and screamed at the social worker.

3

The minor appeared unaffected by his mother's tantrum as if this was a normal occurrence.

Mother tested positive for various drugs three times between detention and the date of the jurisdiction report. She failed to show up for her substance abuse intake. Father, similarly, tested positive twice at the end of July 2020, but then tested negative for all substances a week later. He reported to his substance abuse intake as required.

Despite the fact father had a criminal conviction that may have made him eligible for bypass of reunification services, the Agency stated it was in the minor's best interest to provide him with services because the child was well bonded with his father as his primary caregiver. The Agency proposed a case plan and supported the goal of reunification.

In the addendum to the report filed two months later, the Agency reported the parents made minimal progress in the services offered to them. Mother did not engage with parent partner, inconsistently engaged with her therapist and psychiatrist, and refused substance abuse treatment. She failed to submit to drug testing several times, and she tested positive for methamphetamine on other dates. Father failed to follow through on his substance abuse treatment, failed to test several times, and tested both positive and negative for methamphetamine on different dates. The parents did not engage in parenting classes and were inconsistent in their visitation. When they did attend, they were late for every visit and constantly argued and bickered with each other during the visits. When they did engage with the minor, however, the social worker reported the parents were loving and nurturing.

The parents submitted at the dispositional hearing, although father reported to the juvenile court he and mother had a personality conflict with the parenting coach. The court found the amended petition true, declared the minor a dependent, continued his out-of-home placement, granted visitation, and ordered the parents to complete their reunification plans.

4

*Section 366.21 Status Review Hearing*

The section 366.21 status review report stated while the parents started to make minimal progress on the court ordered services, they had not demonstrated the ability to follow through to provide a stable, violence free, and sober home for the minor. The report recommended the court continue to declare the minor a dependent of the court, terminate the reunification services, and schedule a section 366.26 selection and implementation hearing.

At this point, the report noted the minor was a picky eater, exhibited autistic behaviors, and his speech was delayed. His caregiver reported the minor was making progress with his speech and using words to communicate his needs.

The status review report summarized information from the parents' most recent visitation with the minor and included the visit logs and reports. There were a few bright spots in some of the visits. The parents engaged in play activities he liked, provided the minor with comfort and hugs while they visited, and engaged in playdough play. At times the minor was excited to see mother and father; at other times he showed no reaction to their arrival. The parents engaged with the minor, cuddled him, and read to him.

Much of the interaction between the parents and the minor during visitation had a negative impact on minor. The report chronicled the parents regularly bickered back and forth during supervised visitation and in front of the minor. The parents were resistant to parent coaching during the visits. At times during visitation, the parents were not focused on their two year old at all. Both parents struggled to provide nutritious meals for the minor during visits despite efforts to instruct them otherwise. They brought cookies, candy, donuts, and sugary drinks and did not know when the minor was hungry. The parents did not carefully supervise the minor during the visitation and, on one occasion, he ran away from them, nearly making it into the parking lot. The parents did not show empathy towards the minor during visitation and did not let him rest, even when he was

tired. The parents did not check the minor's diaper unless prompted by the visit coach. The parents did not appear equipped to handle necessary discipline or follow through with the minor during the visits.

According to the court-appointed special advocate (CASA) report, the minor's caregivers did not see any differences in the minor's behavior after the visits. Further, the minor was happy and comfortable in his placement, and his caregivers were open to being a permanent placement for the minor. The minor had begun to blossom and communicate in their care. The CASA volunteer noted the parents had threatened the well-being of the caregivers if they gained permanent custody of the minor.

At the six-month status review hearing, father and mother submitted on the reports. The juvenile court terminated reunification services and set the case for a section 366.26 hearing to select a permanent plan for the minor. The court reduced the parents' visitation to every other week for an hour.

*Section 366.26 Hearing*

The section 366.26 report recommended the minor remain a dependent of the court, the court terminate the parental rights of mother and father, and the court select adoption as the permanent plan. The report further noted, the minor was a quiet three year old who, at the time of his initial placement, could not formulate words, and he had grown into a child with an increased vocabulary and the ability to use words to express his feelings and socialize with other children.

The report asserted the minor was adoptable due to his young age, lack of significant developmental issues, and his resilience in overcoming the trauma and neglect he was exposed to at an early age. He had benefited and made progress, physically, mentally, and educationally due to the stability of the constant routines in his current placement. The caregivers had requested they be considered for adoption.

The report stated the minor's caregiver told the Agency the minor continued to be less and less interested with visiting his parents and did not ask to visit with them. She

6

also shared while he used to ask about his parents when they drove by the Agency building, he no longer did so. The caregiver reported the minor did not recognize mother as his "mommy" in a photo she sent to the caregiver. The Agency representative that supervised the visitation observed the minor was resistant to his mother's hugs and kisses. During those visits, the report reflected the parents engaged with the child. The minor, however, continued to run away from his parents and they did not set appropriate boundaries. The parents continued to arrive late to visits and continued to bring cookies to visits despite being instructed not to, and the minor got sick from those cookies. The visit notes also stated the parents brought toys to the visits, they engaged H.N. in learning and language activities, and the minor appeared happy at the visits.

At the contested 366.26 hearing, the parents requested the court order a bonding study. The Agency objected to this late request and the juvenile court denied it. The court granted the caregivers' motion to be designated as de facto parents.

The Agency submitted the matter on its reports. Father cross-examined the social worker. The social worker testified the minor experienced trauma when he was originally detained. The social worker observed short portions of two supervised visits and specifically recalled a single visit between the minor and the parents. At that visit, the minor was happy to see his parents and the social worker had no concerns regarding that visit. The social worker confirmed the minor was also happy to visit with his father shortly before the section 366.26 hearing. The social worker also described the bond between the minor and his father as the father is engaged with and plays with the minor during visits. The social worker testified severing the parental bond was in the minor's best interests because the minor would have an opportunity to be in a stable environment with new parents who were willing to access the resources necessary to meet his needs.

Based on the reports and the cross-examination of the social worker, the parents argued the beneficial parent exception applied and requested that the court not terminate their parental rights.

7

After receiving the evidence and hearing the arguments of counsel, the juvenile court took a recess. When it returned to session, the juvenile court stated it had reviewed *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and other cases. The juvenile court informed the parties the entire case was about the minor's best interest. The juvenile court again denied the request to suspend the proceedings to allow for a bonding study because a bonding study would add another six months of delay, and the record contained sufficient information for the juvenile court to rule.

The juvenile court stated its decision was not based on isolated good or bad things that happened during visitation but on their cumulative impact. The court specifically identified interactions that negatively affected the minor: the parents' constant bickering, their failure to bring diapers, and their bringing unhealthy food to visitation.

The juvenile court found by clear and convincing evidence, the minor was adoptable. It found the parents participated in regular visitation. It also found there was a parental relationship between the parents and the minor. The juvenile court stated the key question in this case was whether "terminating the relationship [would] be so more detrimental to [the minor] th[a]n the benefit he would gain in proceeding with [] permanency." The juvenile court stated: "The most persuasive evidence before me that leads to my decision is I see objective evidence he has made incredible strides in his communication skills[,] he needs routine[.] I find they are very beneficial the routines he has been given. As I say[,] nothing I am not deciding based on a single visit or single instance, but the patterns of bringing sugar to every visit and giving it to him because he liked it but it's not good for him. He is also a picky eater. His nutrition is a big deal. The trying to set up physical boundaries. I mean he is outside[.] [T]here are a couple of times that luck played a part that he managed to be grabbed or stopped just before he got into traffic. Well luckily there is a big parking lot there. There [are] patterns that the consistency that I am finding he needs he is getting from the [caregivers] better than through his biological parents. He is socializing with other kids[.] I find that those

8

efforts that the [caregiver's] experience . . . of 12 years of working as a para-educator will be a benefit to him."

The parents timely appealed termination of their parental rights.

## II. DISCUSSION

Both parents contend the juvenile court erred in terminating their parental rights because they established the beneficial parental relationship exception. Father further argues the juvenile court considered improper factors in making this decision. We affirm the juvenile court's orders.

### A. *Legal Standards and* Caden C.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) The court should decline to terminate parental rights only if the parents can establish termination would be detrimental to the child under one of the statutory exceptions. (*Caden C., supra*, 11 Cal.5th at pp. 630-631.)

The beneficial parental relationship exception applies when: "The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and conduct with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) There are three discrete elements a parent must show by a preponderance of the evidence to establish the exception: "[(1)] The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. [(2)] Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And [(3)] the

9

parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) It is the parents' burden to show the beneficial parental relationship exception applies by a preponderance of the evidence. (*Id.* at pp. 636-367.)

Our Supreme Court recently analyzed these factors in more depth in *Caden C.* The Supreme court stated, the first element is "straightforward," and is satisfied if the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.)

The second and third elements are focused on the child's attachment to the parent, and the analysis is informed by: " '[T]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) "[I]n assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Ibid.*) Thus, courts in effect consider "what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

*Caden C.* also clarified that, when deciding whether termination of parental rights would be detrimental to the child, the court should not compare the parents' attributes as custodial caregiver(s) relative to those of the potential adoptive parent(s). (*Caden C., supra*, 11 Cal.5th at p. 634.) The court can, however, consider how a new, stable home may alleviate the emotional instability and preoccupation, which can lead to difficulties for the minor by providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental. (*Id.* at p. 634.)

10

Further, a parent's lack of progress in addressing the issues that led to dependency does not categorically bar the application of this exception. (*Caden C., supra*, 11 Cal.5th at p. 637.) Otherwise, the exception would never apply because a section 366.26 hearing is held when a parent has not been successful in addressing the problems leading to dependency. (*Ibid.*) At the same time, the parent's inability to address the issues leading to dependency may be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*) When the parent's struggles speak to the benefit, or lack thereof, of continuing the relationship, those struggles are relevant and properly considered to that extent. (*Ibid.*) These failures are relevant to the extent they inform the central question before the court: "[W]ould the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

The Supreme Court also set forth the applicable standard of review for the beneficial parental exception: "A substantial evidence standard of review applies to the first two elements," and the third element, given it is a hybrid of factual determinations and discretionary balancing, is "properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at pp. 639, 640.) "But where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*Id.* at p. 641.)

B.  *Analysis*

We conclude the juvenile court did not abuse its discretion in finding the parents failed to demonstrate they had a substantial and positive emotional attachment to the minor such that the termination of that bond would result in detriment to the minor when balanced against the security of a stable adoptive home.

At the outset, the juvenile court told the parties it just finished review of *Caden C.* The court found the parents had established they visited the minor and formed a parental role with the minor, and no party takes issue with this ruling.

11

The juvenile court also found there was a relationship. But the question remaining was whether it was a beneficial relationship, the continuation of which, would benefit the child such that the termination of parental rights would be detrimental to the child. In answering this question, the juvenile court properly reviewed and weighed the relevant factors when it found the exception does not apply here. First, the juvenile court considered the minor's young age. When he was detained, the minor was two years and eight months old. At that time, he was unable to formulate words and was not on track in several development areas. He had spent the last 14 months in his placement, or one-third of his life, away from the parents as of the date of the 366.26 hearing.

While there were some positive effects on the minor during his visits with the parents, the visit logs and information presented to the court demonstrated the interactions between the parents and the minor had primarily negative impacts on the minor. The parents brought him unhealthy food on a regular basis, even making him sick on one occasion, despite repeated requests they not do so. The parents failed to adequately supervise the minor allowing him to run off and, one time, almost into the parking lot. The parents did not show concern or empathy for the minor during visitation, and they did not set appropriate boundaries for the minor.

By the time of the section 366.26 hearing, the Agency's report noted the minor was less and less interested in his biological parents and had stopped asking about them. He was resistant to his mother's hugs and kisses and did not recognize her in a photograph as his mother. When he returned home from visits with his parents, he seemed unaffected.

In light of the minor's young age, the negative impacts of his interactions with the parents at visits, and the minor's diminished bond with them, the parents failed to show the minor had a substantial positive attachment or that termination of that attachment would be detrimental to the minor in light of the benefits of an adoptive home. (*Caden C., supra,* 11 Cal.5th at p. 636.)

We reject father's argument the juvenile court's ruling "raises the spectre the court gave undue weight to [] improper factors" by comparing the attributes of the parents to those of the caregivers. The juvenile court appropriately noted the minor made "incredible strides in his communications skills," due to the "very beneficial" routines of his current placement. In noting this, the juvenile court properly weighed this information to assess the countervailing benefit a new adoptive home would have for the minor when balanced against the impact of terminating the parental relationship. (*Caden C., supra,* 11 Cal.5th at p. 633.) If mother's and father's parental rights were not terminated, the minor would be denied a permanent, stable, adoptive family with his own sibling, that has the kind of routine the minor needs.

Further, the juvenile court demonstrated its knowledge of the appropriate focus of *Caden C.* when it identified the negative impacts of the failure of the parents to provide nutritional food, appropriate physical boundaries, and for the child's social growth during their visits. The court properly used the child's success away from the parents to substantiate the negative impact generated by the parents' interactions with the minor during their visitation as contrasted with the positive strides the minor made when he was not with his parents.

Father also asserts, the juvenile court's ruling "seemed to require the parents to have 'cured' the deficits that prevented them from regaining custody in the first place." There is nothing in the court's ruling that suggests it considered the parents' inability to overcome their struggles with substance abuse or domestic violence or to comply with their reunification plan. Rather, the court properly focused on the interaction between the parents and the minor to determine if there was a beneficial relationship and to the extent there was one, whether terminating that relationship would be detrimental to the minor when balanced against the stability of an adoptive home. The court acknowledged this as the basis for its decision when it said, "Everything today is about [the minor's] best interest. And that is why I do have to bring the focus . . . back on him, not the two of

13

you."

We further reject father's argument to the extent it suggests the juvenile court improperly considered the parents' lack of progress in obtaining and exercising appropriate parenting skills. As sanctioned by *Caden C.*, the juvenile court properly focused on the interaction between the parents and the minor during these visitation sessions to determine whether the parents' interactions had a positive or negative effect on the child. (*Caden C., supra,* 11 Cal.5th at p. 638.) Their repeated failures in this regard had a negative effect on the child and support the finding there was a lack of a substantial, positive, emotional attachment to the parents. This was proper.

We thus conclude the trial court did not abuse its discretion in finding the parental relationship exception does not apply.

### III.  DISPOSITION

The juvenile court's orders are affirmed.


/S/

---
RENNER, J.



We concur:


/S/

---
HULL, Acting P. J.


/S/

---
DUARTE, J.