Filed 3/23/22  In re L.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re L.C. et al., Persons Coming Under the Juvenile Court Law. | C094535 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MAR.C. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. JD239750, JD239751) |

Mar.C. (mother) and Man.C. (father), parents of the minors, appeal from the juvenile court's orders terminating parental rights and freeing the minors for adoption. (Welf. & Inst. Code, §§ 366.26, 395.)[1]  The parents claim the juvenile court erred in

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

failing to find termination of parental rights was detrimental to and not in the best interests of the minors where tribal authorities indicated a preference for guardianship for the enrolled minor. We disagree and will affirm the juvenile court's orders.

BACKGROUND

A detailed recitation of the background of this case is unnecessary given the limited nature of the parents' claim. The facts and procedure relevant to the sole issue on appeal are as follows.

The minors, L.C. (then three years old) and her half sibling T.C. (then five years old), came to the attention of the Sacramento County Department of Child, Family and Adult Services (the Department) after reports that the parents had a history of, and had recently been engaging in, domestic violence in the presence of the minors. The minors were removed from the parents, and the Department filed dependency petitions on behalf of the minors pursuant to section 300, subdivision (b).

The juvenile court ordered the minors detained and that they remain placed in the home of the maternal cousin and her husband, where they had been staying pending the jurisdiction/disposition hearing. The court found Man.C. to be the presumed father of L.C., and also found that R.M. "may be the adjudicated father" of T.C. Mother and Man.C. denied any Indian heritage with respect to L.C. and the court found L.C. was not an Indian child for purposes of the Indian Child Welfare Act (the ICWA) (25 U.S.C. § 1901 et seq.). As for T.C., mother informed the social worker that R.M. had Indian heritage with an unknown tribe.

In May 2019, the court sustained the allegations in the petitions and exercised jurisdiction over the minors, adjudged L.C. a dependent of the juvenile court, and ordered continued out-of-home placement for L.C. with reunification services and visitation for the parents. The following month, the court adjudged T.C. a dependent of the juvenile court and ordered continued out-of-home placement and reunification services for mother. The court also reviewed R.M.'s parental notification of Indian status indicating

2

he was or might be a member of, or eligible for membership in, the Round Valley Indian Tribe (the Tribe), and directed the Department to conduct the appropriate ICWA inquiries.

Following several relative placement hearings, and submission of all counsel on the recommendation for placement, the court ordered the minors remain placed with the maternal cousin and her husband, an approved resource family. As of June 17, 2020, the minors were still living with and maintained a healthy attachment to the maternal cousin and her husband, who were willing to provide permanency for the minors.

The Department eventually recommended the court terminate services to the parents and set the matter for a section 366.26 hearing, reporting the parents failed to make progress in their case plan services and failed to demonstrate long-lasting behavioral changes on the issues that resulted in the minors' removal. The parents' failure to progress in services continued and, on October 1, 2020, the court terminated services and set the matter for a section 366.26 hearing.

Before the section 366.26 hearing, the Department filed a section 388 petition, based on information obtained from the Tribe that T.C.'s father was an enrolled member and T.C. was eligible for membership, requesting that the court find T.C. to be an Indian child within the meaning of the ICWA. The court granted the petition on January 6, 2021, found T.C. to be an Indian child, and ordered the Department to provide notice to the Tribe and comply with all ICWA requirements.

The January 2021 selection and implementation report stated the ICWA did not apply to L.C. but did apply to T.C., and that the Department provided the required ICWA notices to the Tribe. The Department noted that it remained in contact with the tribal social worker and continued to assess permanency for T.C. The minors had been with the maternal cousin and her husband for nearly two years and had adjusted well to placement, making significant strides in mental health stabilization and achieving at or above grade level for their respective ages. The Department assessed the minors and

3

determined them both to be generally adoptable due to their young age, good overall health and development, and mental health stability, and recommended a permanent plan of adoption. The caregivers were supportive of T.C.'s Indian heritage and agreed to keep her connected to the Tribe through cultural events and "open communication." For its part, the Tribe wanted to maintain the minor's connection to the Tribe, but did not support a tribal customary adoption, agreeing only to a permanent plan of legal guardianship.

On January 21, 2021, the ICWA expert Richard England, Sr., a licensed clinical social worker, prepared a report regarding the minors wherein he opined that based on his review of the information provided to him, placement of the minors in the parents' home was likely to result in serious emotional or physical damage to the minors. He further opined that the minors were placed in a preferred ICWA relative placement where they were doing extremely well, and their current placement was the "most appropriate and least restrictive setting at this time that most approximates a family situation taking into consideration the needs of the Indian child." England reported that the social worker and the current caregivers assured him the minors would have "every opportunity available to have the opportunity to develop and maintain a meaningful connection to their Tribal culture and Tribal community," which he felt was very positive for the minors and important for their overall health, development, and well-being. He noted how important it was for Indian children to learn about and be connected to their tribal heritage "because it promote[d] the ongoing existence of their Tribe" and enabled the children to pass on oral history to the next generation to support and strengthen the Tribe. He noted further that the Tribe had a "great support system" within its tribal community that advocated strongly for their families and children to participate in and learn about their customs, traditions, ceremonies, and culture in general. Tribal activities and gatherings also provided opportunities for non-Indian siblings to participate in and learn about the

4

Tribe's culture. Finally, England noted the Tribe supported guardianship but not a traditional or a tribal customary adoption as the permanent plan for the minors.

The Department reported that during a February 2, 2021 child and family team meeting attended by the parents, the social worker, the tribal social worker, and the caregivers, the tribal social worker again confirmed that the Tribe supported only legal guardianship and rarely offered tribal customary adoptions, which were "only done for special circumstances." The team agreed that guardianship for both minors would be more appropriate than adoption for L.C. and guardianship for T.C. The team discussed T.C.'s enrollment in the Tribe, and the tribal social worker reported she would inform the enrollment center and complete an emergency enrollment.

In an addendum report, the Department stated that it had attempted unsuccessfully to contact the tribal social worker and the child and family services director on at least three occasions to request to be heard by the tribal council regarding a tribal customary adoption for T.C. The Department decided that keeping T.C.'s connection with the Tribe outweighed the benefits of a traditional adoption. The caregivers supported a common permanency plan for both minors and were therefore open to providing the minors with permanency in the form of a guardianship. Based on the minors' sibling bond and the considerable amount of time in placement, the Department recommended a permanent plan of legal guardianship for both minors.

At the initial selection and implementation hearing, the tribal social worker informed the court that T.C. would lose her connection with the Tribe in the event of a traditional adoption, and that the Tribe did not agree to adoption as the permanent plan. However, the representative confirmed that if T.C.'s tribal membership were established, she would be recognized as a member of the Tribe and the tribal resources would continue to be available to her even if she were adopted by someone else. The court continued the hearing to allow the parties to gather more information as to the status of

5

T.C.'s enrollment with the Tribe and what benefits she stood to lose if parental rights were terminated and she were adopted.

In a fourth addendum to the section 366.26 report, the Department reported the tribal social worker's confirmation that once T.C. became an enrolled member of the Tribe, she would be eligible for numerous tribal benefits, including a parcel of land once she turned 18 years old, medical care at Indian clinics, receipt of tribal temporary assistance for needy families, and COVID-19 pandemic relief funds, as well as knowledge about her extended family and education regarding the history of the Tribe. The ICWA director reported that once enrolled in the Tribe, T.C. would be eligible for benefits including heirship land, housing, tribal temporary assistance to needy families, cultural resources, education, free healthcare, tax exemption, and other benefits. The ICWA director reported that traditional adoption could affect enrollment, however, because the Tribe did not support traditional adoption and T.C. would be at risk of losing her benefits should she be adopted. Given the conflicting information provided by the ICWA director and the tribal social worker, the Department recommended traditional adoption for both minors once T.C.'s enrollment was completed so that her access to tribal benefits would not be disrupted. However, if termination of parental rights would make T.C. ineligible for tribal benefits, the Department recommended legal guardianship for both minors with the current caregivers, as "tribal benefits outweigh the benefits of adoption."

The court again continued the section 366.26 hearing to ensure T.C. was enrolled with the Tribe. During a subsequent pretrial conference, the court was informed that T.C. had become an enrolled member in the Tribe on May 13, 2021.

On June 28, 2021, the Department reported that T.C.'s enrollment in the Tribe was certified on May 14, 2021. Despite numerous attempts by the Department to communicate with the Tribe regarding the potential impact of a traditional adoption on T.C.'s tribal benefits, the Tribe did not respond.

The contested section 366.26 hearing commenced on July 22, 2021. The ICWA expert, Richard England, testified consistent with his January 21, 2021, report. The Department recommended termination of parental rights to free the minors for adoption. Minors' counsel informed the court that the Tribe's enrollment clerk had confirmed that T.C. was an enrolled member of the Tribe and neither termination of parental rights nor adoption would affect T.C.'s membership with the Tribe.

The Tribe's representative at the hearing stated, "My update from our director is she had said the tribe does not agree. The tribe wants guardianship, not adoption." The court inquired, "Did you have any other argument as to why I should select a less permanent plan for the child?" The Tribe's representative responded, "I don't. That's what I have from our director." The parents objected to termination of parental rights and adoption, arguing legal guardianship was the Tribe's preferred plan for T.C. and should be ordered for both minors given the sibling relationship.

The court found the minors were likely to be adopted and there was no compelling reason to determine that termination of parental rights would be detrimental to the minors. In that regard, the court noted it had no evidence before it that termination would substantially interfere with T.C.'s connection to her tribal community or her tribal membership rights. The court stated that while the Tribe's opinion that guardianship was the desired plan "does carry some level of weight," the court viewed T.C. "in conjunction with the other evidence before [it] and that is that there is a sibling in the home, and that sibling is very much an adoptable child." The court further noted that the Department attempted to obtain specific information from the Tribe to allow the court and the Department to conduct a full assessment of T.C.'s well-being, but the Tribe had not provided much information or shown a willingness to engage with the Department to provide the requested information.

The court found the evidence was not adequate to support a finding that the Tribe's desire for guardianship was consistent with T.C.'s best interests. The court also

noted that legal guardianship was "nowhere near as permanent as adoption" and would mean the minors "somewhat live in some level of limbo with the parents able to file ongoing petitions to seek to terminate that guardianship and disrupt the children's stability and life even if it's only for the purposes of the ongoing proceedings regarding whether or not it's appropriate to terminate that guardianship." Based on T.C.'s relationship with L.C., the connection between the siblings, and the "family household that she is in," the court found that freeing both minors for adoption was consistent with the best interests of both children and therefore terminated parental rights.

DISCUSSION

The parents contend the juvenile court erred when it found termination of parental rights was in T.C.'s best interests and would not be detrimental to her. We find no merit to this claim.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368, original italics.)

Before the juvenile court may find an exception to adoption for an otherwise adoptable child, a parent must establish a "compelling reason for determining that termination would be detrimental to the child" due to one of several specified circumstances. (§ 366.26, subd. (c)(1)(B).) One such exception is when "[t]he child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to: [¶] . . . [¶] . . . The child's tribe has identified guardianship, foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement for the child." (§ 366.26, subd. (c)(1)(B)(vi)(II).)

8

"The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights. [Citation.] 'Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) "We review the juvenile court's ruling declining to find an exception to termination of parental rights for abuse of discretion. [Citation.]" (*Id*. at p. 1038.)

Here, the minors were found to be generally adoptable, a finding the parents do not dispute. The parents therefore were required to establish a compelling reason for the court to determine that termination of parental rights would be detrimental to the minors. (§ 366.26, subd. (c)(1)(B).) Correctly acknowledging that the court was not required to follow the Tribe's recommendation for a permanent plan, and admitting there was evidence that T.C.'s relative caregivers would encourage the minor to be active in efforts to stay connected to her tribe, the parents nevertheless point to the Tribe's preference for a legal guardianship and argue that termination of parental rights was "premature" because the evidence showed T.C.'s tribal membership rights and benefits would "likely be interfered with as reflected in the Tribe's concerns."

Relying on only a portion of the tribal social worker's statements, the parents ignore evidence before the court to the contrary. The tribal social worker ultimately confirmed that once T.C. became an enrolled member, the Tribe would "always recognize her as a member" and provide her with tribal resources "even if she is adopted by somebody else." The Department confirmed that T.C.'s enrollment in the Tribe was certified on May 14, 2021. Thereafter, at the selection and implementation hearing, minors' counsel informed the court of the Tribe's e-mail confirming that T.C. had become an enrolled member and that neither termination of parental rights nor adoption would affect T.C.'s membership in the Tribe. The Tribe's representative who appeared at

9

the hearing reiterated the Tribe's strong preference for guardianship in order to preserve T.C.'s connection to the Tribe, but when asked by the court why a less permanent plan should be selected for T.C., had nothing to add. Neither the Tribe's representative nor the parents provided any additional evidence to demonstrate that adoption was not in T.C.'s best interest.

We conclude the juvenile court did not abuse its discretion in declining to find an exception to adoption based on the Tribe's identification of legal guardianship as its preferred permanent plan. (*In re T.S., supra*, 175 Cal.App.4th at p. 1040 [holding that juvenile court has discretion to find adoption in child's best interest even where a tribe identifies guardianship as its preferred permanent plan].)

DISPOSITION

The juvenile court's orders are affirmed.


       KRAUSE       , J.


We concur:


    HOCH      , Acting P. J.


    EARL      , J.


10