Filed 7/29/24  Alexis L. v. Superior Court CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Alexis L.,<br><br>        Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Respondent;<br><br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | A170509<br><br>(San Francisco City & County Super. Ct. Nos. JD22-3318, JD22-3318A) |

Alexis L., mother of S.L. and O.L. (Mother), petitions this court for extraordinary relief from the juvenile court's order terminating her reunification services and setting a permanency planning hearing.  (Welf. & Inst. Code, § 366.26.)[1]  Mother contends the court abused its discretion in terminating her reunification services because real party in interest, San Francisco Human Services Agency (Agency), failed to provide adequate

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

reunification services.  We deny the petition and deny as moot Mother's request to stay the section 366.26 hearing.

## I.  BACKGROUND

### A. *The Dependency Petition and Exercise of Jurisdiction*

In November 2022, the Agency received a report from Mother's neighbor of general neglect of then six-year-old S.L. and three-year-old O.L. The neighbor alleged that when she heard "persistent crying" from O.L., she entered Mother's apartment and found her unresponsive on the floor, with "[s]ubstances and paraphernalia" nearby.  After paramedics arrived, Mother woke up and admitted to smoking fentanyl.

On December 23, 2022, the Agency filed a dependency petition alleging that S.L. and O.L. came within section 300, subdivisions (b)(1) and (c). Specifically, the petition alleged that Mother had substance abuse issues which impeded her ability to care for S.L. and O.L.  In addition, Mother required further assessment and treatment for her mental health.  The petition further alleged that there was a substantial risk the children would suffer serious physical harm or death, noting that in 2017, S.L. was temporarily removed from his parents' care after he ingested heroine and methamphetamine.  The petition also alleged that the children were suffering serious emotional damage.[2]

S.L. and O.L. were taken into protective custody in early January 2023. A few days later, the Agency filed an amended petition adding an allegation that Mother failed to appear for a drug test.

On January 12, 2023, the children were detained by the juvenile court and placed in foster care with supervised visitation for their parents.  A

_____

[2] The children's father is not involved in the present writ petition; these facts will therefore focus on Mother's circumstances.

2

combined jurisdiction/disposition hearing was scheduled for March and later continued to May 8.  The Agency recommended that S.L. and O.L. be declared dependents and that their parents complete a case plan to be considered for reunification.  According to the Agency's disposition report, Mother reported using " 'pills and heroin' " in the past to manage her chronic pain.  Mother said she had a medical condition called mitochondrial myopathy.  Mother claimed that she had been sober since 2017 until her recent relapse.  She was currently working with a substance use counselor at "WARD 93," where she participated in methadone treatment, drug testing, and group counseling.

In May 2023, the Agency filed an addendum report noting that Mother had provided three drug test samples since the detention hearing in January, two of which came back positive for fentanyl and one "that was not valid due to concerns of it being tampered with."

The Agency filed a second amended dependency petition on May 8, 2023, striking the allegations that the children were suffering serious emotional damage and that Mother failed to appear for a drug test.  That same day, at the combined jurisdiction/disposition hearing, Mother submitted to the allegations in the petition as amended, and the juvenile court adjudged S.L. and O.L. court dependents.  Reunification services were ordered for both parents.

## B. The Six-Month Review Period

The six-month status review hearing was set for November 2023.  The Agency recommended that dependency continue and that both parents receive another six months of reunification services.

In its status review report, the Agency summarized Mother's progress in completing her case plan, which had three requirements.  Her first case plan requirement was to manage her physical health so that her pain would

3

not impact her sobriety.  Mother reported that she had been referred to different specialists but "felt her pain level has not been addressed."  She also said that she was taking "multiple" medications.  She provided the social worker with a letter from one of her doctors.  The letter stated that Mother would be "modifying" her activities and was working with another doctor to address her pain.  The social worker was unable to obtain further information or follow up with any of Mother's doctors because Mother would not sign a release of information.

Mother's case plan also included a drug testing requirement.  According to the Agency report, Mother continued to test positive for fentanyl.  She also missed scheduled drug tests and failed to provide documentation excusing some of the missed tests.

The case plan further required Mother to continue working with her substance use counselor at WARD 93 to support her sobriety.  Her WARD 93 counselor gave the social worker a letter stating that Mother "goes above and beyond when it comes to engaging in the counseling process," had participated in the creation of a "relapse prevention plan and safety plan," and had "exceeded" the time for counseling services of 50 minutes per month.  Mother provided the social worker with one of her relapse plans, but the social worker could not follow up on any information in the plan without Mother signing a release of information.

Mother reported that she had completed a substance use disorder assessment, which she claimed recommended that she enter an inpatient program.  However, Mother would not let the social worker see the assessment, so the social worker referred Mother to Homeless Prenatal to complete a substance use disorder assessment.  The Agency report noted that

4

Mother did not complete the assessment because she "did not want to follow up with the Agency's assessment at [Homeless Prenatal]."

Summarizing its concerns, the Agency reported that Mother was restricting the information the Agency was allowed to receive from her service providers by refusing to sign releases of information, thereby limiting the Agency's ability to follow up on services for Mother. Due to Mother's evasiveness and her positive drug tests, the Agency recommended that the juvenile court order her to obtain a substance use disorder assessment at Homeless Prenatal and to participate in inpatient or residential treatment as recommended by the assessment. In conjunction with its status review report, the Agency filed a section 388 petition to modify Mother's case plan to include residential drug treatment.

At the six-month review hearing, the juvenile court renewed the children's dependency, continued the parents' reunification services, and added residential drug treatment to Mother's case plan. The court set the 12-month review hearing for February 27, 2024.

## C. The 12-Month Review Period

The Agency filed a 12-month status review report a few days before the February review hearing. The Agency recommended that dependency continue and that reunification services be terminated for both parents.

Regarding Mother's compliance with her case plan, the Agency reported that she continued to test positive for fentanyl and had missed 14 drug tests since November 2023. Although Mother said she was still working with a substance use counselor at WARD 93, the social worker was unable to obtain any new information from WARD 93 due to Mother signing only a limited release of information.

5

The Agency marked Mother's progress with managing her physical health as "Unknown" because Mother still had not signed releases of information for her medical providers. The social worker received a picture of Mother's medications but could not verify whether Mother was taking her medications as prescribed and whether she was working with her healthcare team to address her pain. Additionally, a clinician from University of California San Francisco Medical Center (UCSF) reported that Mother had not used referrals she received for pain management, physical therapy, and social work. The Agency report also noted that Mother was not using her in-home support services even though she reported having a disability that impacted her daily activities.

As for Mother's new case plan requirement, the social worker explained that in late November 2023, she again referred Mother to Homeless Prenatal for a substance use disorder assessment to determine the level of treatment Mother needed for her substance abuse issues. The social worker had to resubmit the referral in early January 2024, because Homeless Prenatal closed the referral after Mother missed her appointment, and Homeless Prenatal had "exhausted their attempts" to contact her. For the second referral, Mother missed her first appointment but eventually completed the assessment in late January.

The social worker received a copy of Mother's substance use disorder assessment report on February 13, approximately two weeks before the review hearing. Cora Keene, the behavioral health clinician who conducted the assessment, stated in the report that Mother's "[i]ndicated" level of care was "3.3 Medium-Intensity Residential" but her "[a]ctual level of care decision" was "2.1 Intensive Outpatient Treatment." The difference was "[d]ue to the lack of available treatment options in 3.3 level of care and

6

medical complexity creating significant interference to engaging in treatment." In other words, Mother's "medical needs [were] unable to be accommodated in traditional [substance use disorder] treatment facilities." Keene noted that Mother was diagnosed with scoliosis and mitochondrial myopathy, which "effect[ed her] ability to engage with ADL's (activities of daily living) at times and impact[ed] mobility." She recommended that Mother enter an outpatient program at "HR360," which, as indicated by the record, appears to refer to an organization called Health Right 360.

According to the Agency report, Mother claimed she was already in an "intensive" outpatient program at UCSF. However, in a follow up call with Keene, the social worker learned that the program did not "have sufficient care" and "was a regular outpatient program."

The Agency concluded that because Mother did not complete her substance use disorder assessment until the eleventh month of her reunification case, she would likely "not have time to receive treatment and the appropriate level of care needed to address her substance use."

Mother opposed the Agency's recommendation for termination of reunification services and the matter was continued for a contest. In the meantime, the Agency filed an addendum report on May 7, 2024, approximately 16 months after the children were removed from Mother's care.

The Agency reported that Mother continued to test positive for fentanyl and miss drug tests, despite being told repeatedly throughout the case that "every missed test[] is a dirty test."

The Agency reported that another "ongoing issue" was the lack of information regarding Mother's physical health, since she claimed to have a disability that would require accommodations in a residential drug treatment

7

program.  Despite the social worker's "extensive" efforts in working with Mother and her attorney, she was unable to obtain documentation of Mother's disability and the accommodations she would need in a residential program.

The addendum report described the social worker's efforts to provide Mother drug treatment services in the months following her assessment with Homeless Prenatal.  The social worker contacted Keene for assistance in locating an appropriate residential program, but Keene was unable to find a program that would provide nursing care for Mother.  Keene said that Mother could enter an existing residential program but would "need to get her [primary care physician] on board with open communication with the program."  The social worker also contacted Jennifer Pasinosky from family treatment court.  In late April, Pasinosky informed the social worker that Mother could attempt to enter a residential program called Women's Hope.  According to the Agency report, it would be Mother's second attempt to enter the program.  When Mother previously attempted to enter the program, she reported that the program could not accommodate her disabilities.

Additionally, per the recommendation in the substance use assessment report, the social worker contacted the director for Health Right 360's outpatient program.  The program made several unsuccessful attempts to contact Mother in March and April to complete an intake.  The social worker was unable to verify that Mother completed the intake.

The social worker also held a "providers meeting" to obtain information from Mother's doctors about services she needed to stay sober.  The social worker told Mother to notify her providers about the meeting, but most of her providers did not attend.  During the meeting, Mother was asked to "work on getting her [in-home support services] person to provide support" as

8

recommended by her substance use assessment. Mother also said she would attend another intensive outpatient program but later claimed in follow up calls with the social worker that the program did not support her needs.

### D. The Contested Review Hearing

The contested 12-month review hearing was held on May 15, 2024. After reports were admitted into evidence, the parties elicited testimony from Stefani Sanchez, the social worker assigned to this matter since May 2023.

Sanchez testified that Mother had told her she (Mother) would enter a residential drug treatment program only if the program could provide her accommodations for her disability. Sanchez asked Mother for documentation verifying her disabilities and the accommodations she required and medical releases of information. Mother promised to provide the requested documentation but ultimately provided only a release of information for one of her providers.

Regarding Keene's substance use disorder assessment, Sanchez testified that she was not trained on how to "interpret" those types of assessments but understood that different levels of care could be recommended for different individuals and that the recommended level of care represented the "best chance for the client to recover." She said she usually used the assessment's recommendations to tailor services to a particular parent. In this case, she knew that the "actual level of care decision" of "2.1 intensive outpatient treatment" was lower than the recommended level of care for Mother of "3.3 medium intensity residential." She understood that the actual level of care decision was made because Keene did not find any residential treatment programs that could accommodate Mother's medical needs. Likewise, Sanchez was unable to find an appropriate residential program.

9

When asked whether she was recommending terminating reunification services because Mother did not enter a residential drug treatment program, Sanchez answered in the negative, explaining that she was recommending termination of services because Mother "hasn't addressed her substance use throughout the case."

After the matter was submitted, the juvenile court continued dependency and ordered reunification services terminated. It found by clear and convincing evidence that the Agency made reasonable efforts to provide the parents adequate reunification services. In particular, the court noted Mother's failure to cooperate with the Agency: "We have very direct questions that are unanswered. We need proof of the diagnosis. We need proof of the med[ications]. We need the releases. These are very straightforward issues that with a little bit of cooperation, not even a lot, could have been resolved." The court concluded there was no substantial possibility of return of the children to the parents by the 18-month review period. "It is simply incomprehensible to think that seven more weeks of services would result in reunification." The court therefore ordered a hearing pursuant to section 366.26.

## II. DISCUSSION

Mother's sole contention on appeal is that the juvenile court erred in finding the Agency had provided reasonable reunification services to address her substance abuse issues. For the reasons we will explain, we disagree.

"The status of every dependent child in foster care must be reviewed periodically but not less than once every six months. (§ 366.)" (*In re Heather B.* (1992) 9 Cal.App.4th 535, 544.) "At the 12-month review hearing the court must order the return of the minor to parental custody unless it finds, by a preponderance of the evidence, that a return to parental custody would create

10

a substantial risk or detriment to the child's physical or emotional well-being. (§ 366.21, subd. (f).) If the child is not returned home then the court has certain options. If it finds that there is a substantial probability the child will be returned to the physical custody of a parent within six months or if it does not find clear and convincing evidence that reasonable reunification services were provided, then the court must continue the case for up to six months. (§ 366.21, subd. (g)(1).) Otherwise the court must order a hearing pursuant to section 366.26, to be held within 120 days." (*Id.* at p. 545.)

We review the juvenile court's finding of reasonableness of offered services under the substantial evidence test, keeping in mind the clear and convincing evidence burden of proof. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "[O]ur sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) Construing the evidence in favor of the judgment, we determine whether there is " 'evidence which is reasonable, credible and of solid value' " to support the juvenile court's finding. (*Alvin R.*, at p. 971.)

Here, the juvenile court's finding of reasonable services was supported by substantial evidence. S.L. and O.L. were initially detained due to Mother's substance abuse issues. The Agency's reunification plan was designed to assist Mother in resolving these concerns by offering her drug testing services and requiring her to work with her substance use counselor and coordinate with her medical team to help her manage her pain in a way that would not impact her sobriety. The social worker kept in contact with Mother throughout the reunification period, confirmed that she was receiving drug counseling, and made numerous attempts to verify that Mother was

11

receiving adequate medical care. Additionally, by the six-month review hearing, the Agency had referred Mother to Homeless Prenatal for a substance use disorder assessment to determine the level of treatment needed to address her substance use issues.

Although the record indicates that Mother did not receive referrals for more intensive drug treatment services until a few months before the contested 12-month review hearing, it was Mother's own actions that delayed the provision of such services. She refused to share pertinent information with the social worker, including documentation regarding her disabilities and a substance use disorder assessment she said she completed during the six-month review period. She also did not complete Homeless Prenatal's assessment until the month before the 12-month review hearing— approximately three months after the Agency had first referred her to Homeless Prenatal—because she missed appointments. When Mother finally completed the assessment, the Agency promptly referred her to the intensive outpatient program recommended by the assessment, but she failed to complete an intake for the program.

" 'Reunification services are voluntary . . . and an unwilling or indifferent parent cannot be forced to comply with them.' " (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1365.) "If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) In this case, substantial evidence supports the conclusion that Mother's own unwillingness to participate in reunification services and not any failure on

12

the part of the Agency is responsible for any inadequacy in her drug treatment services.

Mother nonetheless places blame on the Agency, contending it did not investigate the impact her conditions of mitochondrial myopathy and scoliosis would have on the services it offered her. The record shows, however, that the Agency made *repeated* efforts to obtain relevant information from Mother's medical providers, and that it was Mother's obstinate refusal to provide the Agency access to that information that resulted in its inability to assess her medical conditions and identify a drug treatment program that would meet her medical needs.

Mother further argues the Agency should have provided her the higher level of care specified in her substance use disorder assessment, 3.3 medium intensity residential, but she ignores the evidence reflecting the lack of such programs for someone with her reported disabilities and her refusal to enter an inpatient program absent accommodations. She also overlooks the evidence that the Agency did, in fact, follow the assessment's recommendation, which was to refer Mother to an intensive outpatient program. The Agency's inability to provide Mother a specific program that could accommodate her medical needs does not mean the services it offered were inadequate. "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 [observing that "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect."].) Under the circumstances in this case, the juvenile court did not err in concluding the services the Agency offered Mother were reasonable.

## III.   DISPOSITION

The petition for extraordinary writ is denied.  The request for a temporary stay is denied as moot.


LANGHORNE WILSON, J.


WE CONCUR:


HUMES, P. J.


SIGGINS, J.*


A170509
*Alexis L. v. Superior Court*


_____

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.